[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 19-11164
Non-Argument Calendar
_____

D.C. Docket No. 8:17-cv-03056-WFJ-CPT

SCOTT MARTIN,

Plaintiff-Appellant,

versus

ALLSTATE PROPERTY AND CASUALTY INSURANCE COMPANY,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Middle District of Florida
_____

(December 10, 2019)

Before ED CARNES, Chief Judge, MARTIN, and NEWSOM, Circuit Judges.

PER CURIAM:

Scott Martin suffered serious injuries after being hit by a car in Florida.  The

driver of that car had an Allstate automobile insurance policy at the time of the

accident.  Martin alleges that Allstate acted in bad faith by failing to settle his bodily injury claims related to that accident despite having had a chance to do so. The district court disagreed and granted summary judgment in favor of Allstate. This is Martin's appeal.

I.

The following facts are not disputed.  Martin is a police officer for the City of Pinellas Park.  He was directing traffic at an intersection on July 17, 2008, when Sengthong Liamsavay drove through it and struck him with his car.  Martin suffered serious injuries.  Liamsavay had an automobile insurance policy through Allstate.  Allstate received notice of the accident the same day it happened and assigned adjuster Cynthia Fletcher to work on the case.

The day after the accident, Fletcher ordered the police report, spoke with Liamsavay, and contacted Martin's wife and employer.  Soon after that she received a statement from Liamsavay about the accident and sent him a letter providing more information about his policy and the next steps involved in the process.  The letter informed him that the value of Martin's bodily injury claims appeared to exceed Liamsavay's policy limits ($50,000) but that Allstate would try to settle the case within those limits.  It also informed him that he had the right to hire his own attorney.

2

On July 29 Fletcher sent Martin a copy of the insurance policy, a check made payable to him for $50,000, and a release form that covered his claims and the claims of his wife. Within a week Martin and his wife gave the check to the City, which was Martin's employer, because it had advised them to do so. The City then forwarded the check to the worker's compensation carrier for the City (the Florida League of Cities).

On August 6 the Florida League told Fletcher that it believed the settlement check should be applied to its worker's compensation lien. The Florida League also told Fletcher that it would investigate and get back in touch with Allstate. On November 6 the Florida League sent Fletcher a letter stating that it was asserting a lien of $89,062 and was returning the $50,000 check. It also asked Fletcher to get in touch to negotiate a lien settlement. On December 3 Fletcher retained attorney Tom Bopp to assist her in handling Martin's claim.

On December 8 the Florida League contacted Bopp and told him that Martin was not ready to sign any releases regarding this claim. It also told Bopp that it wanted the entire $50,000 policy limit to apply towards its lien. Bopp said that Allstate had to base its reimbursement on a percentage of the claim, but the Florida League was not willing to compromise. On December 11 Bopp wrote to the Martins introducing himself and summarizing the current negotiations.

On January 12, 2009, Bopp followed up with the Florida League and was told it had not communicated with the Martins. On March 27 Bopp again contacted the Florida League. On March 30 Bopp sent a letter to the Martins informing them that the Florida League had a lien for payment of worker's compensation benefits that must be resolved and asking that they contact him to advise Allstate what it could do to bring "this matter to a final resolution."

On April 9 Eduardo Jimenez sent a letter to Allstate informing it that he was representing Martin. The letter requested certain information, including affidavits from Liamsavay about his insurance policies and assets, and it also stated that "if there is no real property owned by [Liamsavay] that is not [protected by Florida law], [Martin] will agree to resolve all his claims with [Liamsavay] in exchange for all applicable policy limits being tendered" by the end of April. But the letter stated that Martin would release only his bodily injury claim and that he would not agree to a release containing a hold harmless or indemnity provision. The letter also emphasized that he would not release any other person's or entity's claims, that strict performance with the terms of the offer was required for acceptance, and that a release that failed to comply with the terms of the letter would be treated "as a rejection of this good faith offer."

Bopp worked to obtain the requested information after Allstate received the letter on April 13. He also informed Liamsavay that Martin might not release him

4

from any claims that could be made by Martin's wife.  In response to a question from Bopp, Jimenez stated that the settlement offer would resolve only Martin's claim.  On April 30 Bopp hand delivered a letter to Jimenez which included a settlement check, a proposed release, an affidavit from Liamsavay, an affidavit from the insurance agent, and the insurance disclosure from Allstate.  The release stated that "I, Scott Martin, . . . for myself, my heirs, my personal representatives, successors and assigns fully [release Liamsavay] from any and all claims . . . which I may have had, may now have, or may hereafter have . . . arising out of bodily injuries sustained by me" as a result of the car accident.  Copies of those items were also sent to Liamsavay's lawyer.

Martin rejected the proposed release and settlement.  Jimenez stated in a May 7 letter that he was "surprised and dismayed" that Bopp had attempted to "settle claims of other persons or entities other than my client when doing so was a rejection of our good faith offer," citing the "himself, his heirs, his personal representatives, his successors, and his assigns" language as problematic.  Jimenez said Martin had told him to move forward with a lawsuit.

Bopp responded shortly after by arguing that no court or reasonable person would consider the release's language to cover any other person's claim, and that Martin did not even have the power to release the claims of any other person or entity.  He also asserted that the release applied only to Martin's bodily injury

claim but offered to remove the objectionable language anyway.  Alternatively, he suggested that Jimenez scratch out the language he objected to.  The record does not show that Jimenez responded to Bopp's letter.

Jimenez (at Martin's direction) instead filed a lawsuit in state court.  In his answer to the state court lawsuit, Liamsavay asserted as an affirmative defense that "the action was barred by virtue of settlement.  The plaintiff offered to settle and the defendant accepted and there is, therefore, a binding settlement."  Liamsavay also drafted a motion to enforce the settlement, arguing that Jimenez's April 9 settlement offer was accepted by Liamsavay.  After Martin moved for partial summary judgment as to the settlement affirmative defense, Liamsavay withdrew that defense with prejudice.  The state court lawsuit was resolved by a consent judgment of $1,500,000 against Liamsavay on March 20, 2013.

Martin then filed a lawsuit against Allstate in Florida state court.  His complaint alleged a third-party bad faith claim against Allstate, arguing that Allstate engaged in bad faith when it responded to Martin's April 9 settlement offer by offering a release that "would have released the claims of persons or entities other than [Martin]," thereby "failing to promptly settle the claims against Liamsavay within the Policy's limits when it could and should have done so."  Allstate removed the case to federal court.

Allstate moved for summary judgment.  Martin moved for partial summary judgment, asking the court to conclude that Allstate could have settled Martin's claims had it accepted the terms of his April 9 settlement offer.  The court granted Allstate's motion, finding no evidence from which a jury could infer that Allstate breached the duty of good faith and unreasonably exposed Liamsavay to excess liability.  The court rejected Martin's motion, finding that even if his claims could have been settled there was no evidence that Allstate acted in bad faith.  The court also found that issue preclusion did not prevent Allstate from arguing that it complied with the terms of the April 9 settlement offer.

## II.

We review <u>de novo</u> a district court's grant of summary judgment.  <u>Hulsey v. Pride Rests., LLC</u>, 367 F.3d 1238, 1243 (11th Cir. 2004).  A district court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "A 'material' fact is one that 'might affect the outcome of the suit under the governing law.'"  <u>Furcron v. Mail Ctrs. Plus, LLC</u>, 843 F.3d 1295, 1303 (11th Cir. 2016) (quoting <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248, 106 S. Ct. 2505, 2510 (1986)).  And a "dispute about a material fact is 'genuine' . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  <u>Anderson</u>, 477 U.S. at 248, 106 S. Ct. at 2510.

7

When considering the evidence, courts generally must "view the facts and draw reasonable inferences in the light most favorable to the party opposing the [summary judgment] motion." Scott v. Harris, 550 U.S. 372, 378 (2007) (citation and internal quotation marks omitted) (alteration in original). However, facts need not be viewed in the light most favorable to the nonmoving party where a dispute over those facts is not "genuine." Id. at 380. "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." Id.

### III.

Martin contends that the district court erred in granting Allstate's summary judgment motion because there are several genuine issues of material fact as to whether Allstate acted in bad faith.[1]

### A.

Florida's bad faith law is "designed to protect insureds who have paid their premiums and who have fulfilled their contractual obligations by cooperating fully with the insurer in the resolution of claims." Berges v. Infinity Ins. Co., 896 So. 2d 665, 682 (Fla. 2004). An insurer is obligated "to act in good faith in the

---

[1] In diversity cases such as this one, we apply the substantive law that a state court sitting in the forum state of Florida would apply. Bravo v. United States, 577 F.3d 1324, 1325 (11th Cir. 2009). Here, that is Florida law. See id.

investigation, handling, and settling of claims brought against the insured." Id. at 682–83. That obligation includes settling if a reasonably prudent person would do so. Perera v. U.S. Fid. & Guar. Co., 35 So. 3d 893, 898 (Fla. 2010). A breach of this duty of good faith can give rise to a cause of action for bad faith. Id. In Florida, an injured third party may maintain a bad faith claim directly against an insurer. Macola v. Gov't Emps. Ins. Co., 953 So. 2d 451, 455 (Fla. 2006).

The question of whether an insurer acted in bad faith is determined under a "totality of the circumstances" standard. Harvey v. GEICO Gen. Ins. Co., 259 So. 3d 1, 7 (Fla. 2018). "[T]he critical inquiry in a bad faith [case] is whether the insurer diligently, and with the same haste and precision as if it were in the insured's shoes, worked on the insured's behalf to avoid an excess judgment." Id. "[N]egligence is not the standard," but it is relevant to the question of good faith. Id. at 9. And "the focus in a bad faith case" is on the actions "of the insurer in fulfilling its obligations to the insured," not the actions of the claimant. Id. at 7. The damages claimed in a bad faith case "must be caused by the insurer's bad faith" for a plaintiff to prevail. Id.

Although determining whether an insurer acted in bad faith is generally a question for the jury, courts applying Florida law have granted summary judgment if the undisputed facts would not allow any reasonable jury to conclude the

defendant breached its duty of good faith.  Clauss v. Fortune Ins. Co., 523 So. 2d 1177, 1178 (Fla. 5th DCA 1988); see also Berges, 896 So. 2d at 680.

B.

Martin contends that there is at least a dispute as to whether Allstate acted in bad faith by failing to settle his bodily injury claim in April 2009.  He asserts that his April 9 settlement offer was valid, and Allstate failed to accept it, and it instead proposed an overbroad release that constituted a counteroffer.  Failing to accept the offer, according to Martin, created an unnecessary risk of an excess judgment for Liamsavay.  We disagree.

Because Allstate's proposed release did not include any language that Martin had asked to be excluded, there is no evidence supporting a bad faith finding in this case.  Martin's April 9 settlement offer required that the release not release "any other person or entity's claim other than my client's" and Allstate's proposed release met this requirement.

Allstate's proposed release stated that Martin would:

> for myself, my heirs, my personal representatives, successors and assigns fully acquit, release and forever discharge Sengthong Liamsavay from any and all claims . . . which I may have had, may now have, or may hereafter have because of or arising out of bodily injuries sustained by me [as a result of the accident]." (Emphasis added).

10

Jimenez (Martin's counsel) rejected this release, arguing that it released "other peoples['] or entities['] claims other than my client." He specifically objected to the "my heirs, my personal representatives, successors and assigns" language.

But Allstate's proposal would have released only claims that "[Martin] may have had, may now have, or may hereafter have because of or arising out of bodily injuries sustained by me [as a result of the accident]." The release did not cover Martin's wife's potential claim (despite Jimenez incorrectly suggesting that it did). Nor did it release any other individual's or entity's claims.

Hypotheticals offered by Martin do not demonstrate otherwise. Martin asserts that a reasonable person could refer to a claim transferred from A to B as "B's claim" and thus the release's language could be read to apply to a person other than A. But his own briefing betrays his argument. He objects to the language of the release and offers this scenario as evidence that it could cover "others who could conceivably obtain <u>his claims</u>." (Emphasis added). But releasing <u>Martin's claims</u> is the point of the release. That is why Allstate drafted it the way that it did. The "offensive" language prevented Martin from getting around the release by transferring his own claims to another party.

Under Martin's logic, any proposed claim release could be overreaching because it could prevent a person from transferring his claim to an heir, a personal representative, or an assign. That is because even if the "problematic" language of

11

the release at issue were removed, it still would have prevented Martin from assigning his claim to another. Nova Info. Sys. v. Greenwich Ins., 365 F.3d 996, 1004 (11th Cir. 2004) ("[A]n assignee can acquire no greater rights than those possessed by the assignor himself.").[2] The fact a release stops an individual from being able to effectively transfer his claim to another person does not mean that the release acted to release the claims of other people.

Even if Allstate's proposed language did vary from Martin's instructions such that it was not an acceptance of his offer under Florida contract law, the totality of the evidence cannot support a finding of bad faith given Allstate's actions. This is not a case where the insurer required an overbroad release to settle. Compare United Auto Ins. Co. v. Estate of Levine, 87 So. 3d 782, 784, 787 (Fla. 3d DCA 2011) (requiring an overbroad release to settle).[3] Instead, the undisputed record evidence indicates Allstate was responsive to the April 9 offer; clearly complied with every other condition of the offer; believed that the release language complied with the April 9 offer (but still made clear the release could be altered and it was not meant to add new terms); and offered to change the language immediately after Martin objected. Allstate did not retain obviously problematic

---

[2] Allstate's proposed release having language that is probably redundant does not mean it included noncompliant language or otherwise acted in bad faith.

[3] Additionally, cases cited by Martin such as Trout v. Apicella, 78 So. 3d 681, 684-45 (Fla. 5th DCA 2012), are not bad faith cases but address only whether an insurance company had accepted a claimant's offer under Florida contract law. None of them concerns whether a failure to accept an offer is bad faith. See id.; Villareal v. Eres, 128 So. 3d 93, 100 (Fla. 2d DCA 2013).

12

language such as a hold harmless clause.  Based on the totality of the evidence we affirm the district court's judgment as to this issue.

## C.

Martin's other arguments are waived because he failed to adequately raise them before the district court.  An argument not fairly presented to the district court is generally not considered by this Court.  Resolution Trust Corp. v. Dunmar Corp., 43 F.3d 587, 598–99 (11th Cir. 1995) (en banc).  And simply stating the facts underlying an argument "is insufficient to preserve an argument, the argument itself must have been made below."  Ledford v. Peeples, 657 F.3d 1222, 1258 (11th Cir. 2011).  Hiding the argument in a footnote does not work either. Cf. Four Seasons Hotels and Resorts, B.V. v. Consorcio Barr S.A., 377 F.3d 1164, 1167 n.4 (11th Cir. 2004).

Martin contends that the district court failed to consider the withdrawal of the affirmative defense of settlement in the state court damages lawsuit against Liamsavay as evidence of bad faith.  But between Martin's motion for partial summary judgment and his opposition to Allstate's motion for summary judgment, the closest he came to arguing that the withdrawal of the defense is independent evidence of bad faith was a few sentences in a footnote that suggested the withdrawal of the affirmative defense was improperly motivated by Allstate's self-interest.  And his briefing contains statements such as the "sole issue in this case"

13

is Allstate's failure to settle when it could have.  Given his failure to raise the

argument before the district court we decline to consider it.  See Resolution Trust,

43 F.3d at 598–99.[4]

      **AFFIRMED**.

---

[4] Martin also argues that Allstate's delay in negotiating with the worker's compensation carrier and its failure to keep Liamsavay informed each show bad faith.  Neither of those arguments was raised before the district court, and as a result both are waived.  See id.; Access Now, Inc. v. Sw. Airlines Co., 385 F.3d 1324, 1331 (11th Cir. 2004) ("If we were to regularly address questions—particularly fact-bound issues—that district[] court[s] never had a chance to examine, we would not only waste our resources, but also deviate from the essential nature, purpose, and competence of an appellate court.").