DAVIS, Chief Judge.
Eli Villareal appeals the final judgment for personal injuries and wrongful death entered in favor of Heather Eres, individually, and as personal representative of the Estate of Kevin D. Bryant. Villareal raises several issues on appeal. We conclude that the trial court correctly granted Eres’ motion for partial summary judgment on the issue of settlement and affirm the final judgment.
Heather Eres and her minor child, Kevin Bryant, were in a motor vehicle that was struck from the rear by a vehicle driven by Eli Villareal. The impact of the collision thrust Eres’ vehicle forward into a moving train that was crossing the road just ahead of Eres. The impact of the car’s striking the moving train resulted in Kevin Bryant’s death, as well as serious personal injuries to Eres.
Eres’ attorney contacted Villareal’s insurer, asked for the disclosure of insurance coverage information described in section *95 627.4137(1), Florida Statutes (2008),[1] and offered to settle for policy limits. The offer included a time limit for accepting and referred to restrictions on the nature of the release that Eres would be willing to sign. The insurance company timely responded to the offer with the required information, draft checks for the payment of the policy limits, and proposed releases, one for Eres personally and one for the Estate. Eres’ attorney responded that the releases violated the restrictions specifically delineated in the offer and stated that Eres considered the insurer’s response a rejection of the initial offer and a counteroffer. Counsel advised that Eres rejected that counteroffer and would file suit.
In response to the complaint filed by Eres, Villareal filed an answer and affirmative defenses, one of which was that Eres presented a settlement offer that was accepted by Villareal. Denying that the parties ever entered into a settlement, Eres filed a motion for partial summary judgment on this affirmative defense, which was granted by the trial court. The remaining matters went to jury trial, and the jury awarded Eres a judgment for $10,639,585.36. It is this final judgment that Villareal now appeals.
At the hearing on the motion for summary judgment, Eres argued that the language of the proposed releases was but an attempt to include a hold harmless/indemnification agreement in the release. Eres argued that by the terms of her offer, the proposed language in the releases was considered a rejection of the offer and that there was no settlement as a matter of law. Villareal responded that the releases did not contain a hold harmless agreement and were consistent with Eres’ request. Based on the language of the letters, it was Villareal’s opinion that all of the conditions of the offer had been accepted and met. Additionally, Villareal suggested as an alternative argument that the terms of the releases were not essential elements of the offer, that the signing of the releases was but a ministerial act to effectuate the agreement, and that the releases could be amended by the parties after the acceptance of the offer.
In granting partial summary judgment, the trial court determined that there was no meeting of the minds, thereby implicitly finding that there was no acceptance of the offer based on the language of the releases — which the trial court found to be an essential term of the offer. After reviewing the transcript of the hearing on Eres’ motion for partial summary judgment and the memoranda filed by the parties, it is clear that the trial court found that the language in the releases was in the nature *96 of a hold harmless/indemnification agreement. This determination resulted in the conclusion that the acceptance of the offer was invalid and that there was no settlement because there was no meeting of the minds evidenced by an offer and acceptance, as required by contract law.
On appeal, Villareal again argues that the terms of the releases were not essential elements of the offer and that the releases were subject to further modification after the offer was accepted. He suggests that his acceptance of the other terms was a valid acceptance of the offer and that Eres was contractually bound by that acceptance. We reject this argument and agree with the trial court’s determination that the terms of the releases were essential elements of Eres’ offer. We also agree with the trial court’s ruling that an acceptance that is in variance with the release restrictions delineated in the offer is not a binding acceptance even when accompanied by an offer to further modify the release terms.
In Florida, settlement agreements are governed by contract law. Nichols v. Hartford Ins. Co. of the Midwest, 834 So.2d 217, 219 (Fla. 1st DCA 2002) (“Pursuant to contract law, the acceptance of an offer which results in an enforceable agreement must be (1) absolute and unconditional; (2) identical with the terms of the offer; and (3) in the mode, at the place, and within the time expressly or impliedly stated within the offer.”). “Settlements are ‘highly favored and will be enforced whenever possible.’ ” Hanson v. Maxfield, 23 So.3d 736, 739 (Fla. 1st DCA 2009) (quoting Robbie v. City of Miami, 469 So.2d 1384, 1385 (Fla. 1985)). However, “[t]he party seeking judgment based on a settlement has the burden to prove assent by the opposing party and must establish that there was a meeting of the minds or mutual or reciprocal assent to certain definite propositions.” Giovo v. McDonald, 791 So.2d 38, 40 (Fla. 2d DCA 2001).
Whether Villareal’s response and proposed releases were an acceptance of Eres’ offer such that a binding settlement was reached must be resolved by a close examination of the contents of the correspondence exchanged by the parties. On March 19, 2009, Eres’ attorney, Peter Ma-caluso, contacted the claims representative for Progressive Insurance Company, the insurer of Villareal. By that letter, the attorney advised that he had reason to believe that the coverage Progressive provided had policy limits of $10,000 per person and $20,000 per accident. He asked that the insurer provide the coverage information affidavits required by section 627.4137. He further indicated that his client was ready to settle for policy limits but wanted to do so by Easter weekend.[2] In addition to the payment of policy limits for bodily injury, Attorney Macaluso asked that the carrier also reimburse Eres the sum of $650 for her son’s personal property that had been destroyed in the accident.
The crucial language of this offer was as follows:
In exchange for the above, my clients, including the estate!,] have agreed to sign a general release of all claims against your insured. Because this claim is only against your insured my clients are unwilling to sign a release which releases anyone or any entity other than your insured. Also my clients agree to satisfy all valid liens out of the proceeds of the settlement. However, my clients cannot agree to a release which has a hold harmless or indemnity agreement in it. Please understand *97 providing us with any release containing anyone or any entity other than the insured, or a hold harmless indemnity agreement, would act as a rejection of this good faith offer to settle this matter.
(Emphasis added.)
Progressive responded to this letter on April 8, 2009. The response included the information and affidavits regarding coverage requested in the letter and drafts for a total of $20,000. Additionally, the letter explained that although the prior payments to the lien holder on the vehicle and to Eres personally for her equity in the vehicle exhausted the $10,000 limits on the property damage coverage, a draft for the $650 was included “due to the very tragic circumstances of this accident.”
Also enclosed were the “proposed” releases, which included the following language:
The undersigned reserve(s) their right to pursue and recover future medical expenses, health care and related expenses from any person, firm, or organization who may be responsible for payment of such expenses, including any first party health or first party automobile coverage, if so entitled. However, said reservation does not include the party(ies) released who is/are given a full and final release of all claims, including, but not limited to, past, present, or future claims for subrogation arising out of the above-referenced accident.
(Emphasis added.) Progressive’s letter referenced the releases by stating: “Please notify me if you require changes to either release.” The letter closed with the following statements: “ We believe that we have complied with all of the requests outlined in your letter. Please notify us if there is any additional information you need to resolve these claims.” The next day Villareal’s counsel, Katherine Shed-wick, wrote to Attorney Macaluso advising that she was sending the original affidavit executed by her client.[3] The letter stated: “I believe that my client and Progressive have satisfied all conditions of your demand at this time. If you disagree and require anything further, please advise immediately so that I may work diligently to timely address the issue.”
On April 14, 2009, Attorney Macaluso contacted Progressive’s claims representative to advise that he considered the April 8 response and the enclosed releases to be a rejection of Eres’ offer. He suggested that the language in the proposed releases that referred to “subrogation claims” was in effect a hold harmless/indemnification agreement. Because Eres’ original offer advised that such a hold harmless/indemnification agreement was not acceptable and that a release that included the same would be deemed a rejection of the offer to settle, Attorney Macaluso considered the response to be a counteroffer. He stated that his client would not sign such a release and that he considered the counteroffer rejected. He further advised that he would be filing suit.
On April 22, 2009, Progressive replied that their April 8 response was not a rejection of the initial offer but was an acceptance of it. Progressive’s agent argued that the language in the proposed releases was not an indemnification or a hold harmless agreement. She stated that “the plain wording of the proposed releases require[s] only a release of claims against our insured held by your client and expressly reserves your client’s rights to *98 pursue claims against any and all other first or third parties.” She reminded Attorney Macaluso that the April 8 letter asked that he notify her if he should “require changes to either release.” The letter concluded with the following statement: “If you are, for whatever reason, uncomfortable having your clients execute releases containing the wording ‘... including, but not limited to, past, present, or future claims for subrogation arising out of the above-referenced accident,’ feel free to strike it from the releases.”
The facts of this case are similar to those in Trout v. Apicella, 78 So.3d 681 (Fla. 5th DCA 2012). In that case, Trout was seriously injured as a passenger in a vehicle operated by Apicella and insured by Geico. Geico immediately initiated settlement negotiations by sending an offer to settle with policy limits for the bodily injury liability coverage provided to Apicella and the owner of the vehicle under separate policies. Trout rejected this offer, and the parties continued negotiating as to the proceeds under other types of coverage. Finally, Trout’s attorney sent a letter offering to finalize the settlement discussions. His offer stated as follows:
So just send me a single bodily injury release of your insureds only without any additional language that would require my client to pay their defense costs for claims by third parties. If I have valid checks for all bodily injury liability insurance available to your insureds, along with that release and the complete statutory insurance disclosures, within fifteen days of this letter, my client will sign the release and those claims will be settled.
Id. at 683 (emphasis omitted).
Geico responded by sending a release providing that Trout was releasing Apicel-la and the owner of the vehicle from any and all claims, demands, damages, actions, causes of action, or suits of any kind or nature whatsoever, on account of all injuries and damages, known and unknown, which have resulted or may in the future develop as a consequence of a motor vehicle accident that occurred at Volusia County on or about the 30th of March, 2008.
Id. at 683-84 (internal quotation marks omitted). The letter went on to provide:
We consider the enclosed proposed release a ministerial document which memorializes our settlement of this case.... We do not consider the release a document which creates any new terms or conditions governing our resolution of your claim. If you feel there is any aspect of the enclosed document which does not reflect our settlement of your claim, please contact me immediately so that we can see that the document is revised to reflect the exact terms of our agreement.
Id. at 684 (emphasis omitted).
In response to Geico’s “acceptance,” Trout advised that he was proceeding with the filing of a suit because the release tendered included the “release for all claims, which was not what Trout offered.” Id. After Trout filed his suit, Geico filed its answer and affirmative defenses, one of which alleged settlement and release. Following a hearing on the cross-motions for summary judgment on this affirmative defense, the trial court ruled that Geico’s acceptance was valid and that Trout was bound by the settlement.
On appeal, the Fifth District reversed the trial court’s determination, concluding that Trout’s offer “was an offer for a unilateral contract that required performance by Geico.” Id. The court noted that although Geico indicated that it was willing to change any wording in the release that Trout found objectionable, the only accep *99 tance provided by Trout’s offer was a release that met the terms of the offer, one of which was “one release for the bodily injury claim only that released Geico’s insureds without any indemnification language.” Id. at 685.
The Fifth District concluded:
Performance was an essential requirement for the acceptance of Trout’s offer. Instead of performing, however, Geico proffered a release that did not just fail to meet the terms of Trout’s offer, it blatantly failed.... Geico’s offer to consider any release amendment and explanation Trout might suggest was inadequate and the disclaimer of “new terms” ineffective.... Geico’s offer (probably) to change the release was, at best, a promise to perform, which is not sufficient here to create a binding contract-The language of the offer communicates how it is to be accepted.

Id.

As in Trout, Eres’ offer to settle was an offer for a unilateral contract. That is, she conditioned Villareal’s acceptance on a specified performance — agreement with the exact terms of the release that was contemplated in the offer. Furthermore, Eres’ offer specifically stated that the sending of “any release containing anyone or any entity other than the insured, or a hold harmless indemnity agreement, would act as a rejection of this good faith offer to settle this matter.” Therefore, for Villareal to accept the offer and have a binding settlement with Eres, the release had to meet the specifications in the offer. And Villareal’s overture to alter the release language was not sufficient to constitute an acceptance that would bind Eres to her offer. See Knowling v. Mana-voglu, 73 So.3d 301, 303 (Fla. 5th DCA 2011) (“For acceptance of an offer to bind the maker of the offer it ‘must be absolute, unconditional, and identical with the terms of the offer.’ ” (quoting Montgomery v. English, 902 So.2d 836, 837 (Fla. 5th DCA 2005))).
Villareal argues on appeal that even if the subrogation language of the proposed releases could somehow be understood to be a hold harmless/indemnification agreement, this language was meaningless because it is not clear that a subrogation claim even exists. Furthermore, he argues that if such a claim did exist, Eres could not release Villareal from the subrogation cause of action. Villareal in essence maintains that any language in the proposed releases regarding future subrogation claims is a nullity. We disagree.
It is true that Eres cannot legally release Villareal from liability to third parties who Villareal knows — at the time Eres executes the release — might have a subrogation claim against him. See generally Lincoln Nat’l Health & Cas. Ins. Co. v. Mitsubishi Motor Sales of Am., Inc., 666 So.2d 159,163 (Fla. 5th DCA 1995) (“A tortfeasor cannot expect to rely on a release from the victim if he knows that equity has transferred a portion of the victim’s claim of recovery into the hands of a third party who has paid a part of what the tortfeasor by rights should pay.”); see also Ortega v. Motors Ins. Corp., 552 So.2d 1127, 1128 (Fla. 3d DCA 1989) (“Because the tortfeasor had knowledge of Motors’ perfected subrogation rights when Ortega executed the releases, he was estopped from raising those releases as a defense to Motors’ action.” (emphasis added)). In such case, the release language would be a nullity as to third parties. But it would not be a nullity as to Eres’ liability to Villareal.
Villareal’s proposed releases were not contingent upon the specific facts of the instant litigation, but rather were uncondi *100 tional. If a third party had compensated Eres for some or all of her losses, a subro-gation claim against Villareal would be possible. If the subrogee was successful in obtaining a judgment against Villareal, the language providing that Eres would release Villareal from such liability could arguably become the basis of an action by Villareal against Eres for reimbursement of his payment to the subrogee. Such action would be, in essence, an action for indemnification because by “releasing” Vil-lareal from liability for a subrogation claim, Eres would be in effect assuring Villareal that should a subrogation judgment be entered against him, she would indemnify (release) him against such loss.
The proposed releases included in Progressive’s attempted acceptance would, in other situations, act to hold Villareal harmless for subrogation because as a general rule a subrogee stands in the shoes of the subrogor and thus would be bound by any release given to the tortfeasor by the sub-rogor. See Lincoln Nat’l Health & Cas. Ins., 666 So.2d at 162 (“We think the law is clear that if one who sustains the loss as the result of negligence or wrongdoing of another releases the tortfeasor, an insurer subrogated to the right of the injured party is barred by that release.”).
In this case, without attempting to determine whether the releases would serve as an effective affirmative defense against a subsequent subrogation claim, Eres simply required that a release be presented that did not include any language that could possibly later be used as a basis for any indemnification action. It is the presence of the language in the proposed releases, not the effectiveness of the terms themselves, that does not comply with the offer. The offer clearly stated that such language would be deemed a rejection of the offer, and Eres therefore was justified in treating the response as a rejection.[4]
Finally, Villareal argues on appeal that the trial court improperly accepted parol evidence in making its determination. We recognize that Eres did present evidence below, including the deposition testimony of a Progressive agent who stated that a hold harmless/indemnification action was a possible result of the language at issue and a letter from another Progressive agent sent in another case that described the same language as that at issue here as a “hold harmless” agreement. However, independent of any consideration of that parol evidence, the trial court correctly determined that Villareal and Progressive did not perform under the identical terms of Eres’ offer. Without performance evidencing that both parties had a meeting of the minds as to the terms of the settlement, there was no acceptance and consequently no settlement.[5]
*101 As such, the order granting partial summary judgment was properly entered, and we must affirm the final judgment.[6]
Affirmed.
KELLY and MORRIS, JJ., Concur.

. Section 627.4137(1) provides as follows:
(1) Each insurer which does or may provide liability insurance coverage to pay all or a portion of any claim which might be made shall provide, within 30 days of the written request of the claimant, a statement, under oath, of a corporate officer or the insurer's claims manager or superintendent setting forth the following information with regard to each known policy of insurance, including excess or umbrella insurance:
(a) The name of the insurer.
(b) The name of each insured.
(c) The limits of the liability coverage.
(d) A statement of any policy or coverage defense which such insurer reasonably believes is available to such insurer at the time of filing such statement.
(e) A copy of the policy.
In addition, the insured, or her or his insurance agent, upon written request of the claimant or the claimant’s attorney, shall disclose the name and coverage of each known insurer to the claimant and shall forward such request for information as required by this subsection to all affected insurers. The insurer shall then supply the information required in this subsection to the claimant within 30 days of receipt of such request.

. In 2009, Easter was celebrated on April 12.

. The affidavit attached to the claims representative’s April 8, 2009, letter was a copy of the affidavit executed by Villareal. His attorney then supplemented the response with the original affidavit.

. We do recognize that the proposed releases do not use the terms “hold harmless” or "indemnification.” Nevertheless, the release language purports to give to Villareal "a full and final release of all claims, including, but not limited to, past, present, or future claims for subrogation arising out of the above-referenced accident.” As such it is in the nature of a hold harmless or indemnification agreement. See Trout, 78 So.3d at 683 (describing similar language that required the injured party to release the tortfeasor from "any and all claims, demands, damages, actions, causes of action, or suits of any kind or nature whatsoever” as indemnification language).

. A meeting of the minds is determined by an objective test; it is not what the parties meant but what they said that is determinative. See Robbie v. City of Miami, 469 So.2d 1384, 1385 (Fla. 1985) ("We have consistently held that an objective test is used to determine whether a contract is enforceable.... 'The making of a contract depends not on the agreement of two minds in one intention, but on the agreement of two sets of external signs — not on the parties having meant the same thing but on their having said the same thing.'" (quoting Blackhawk Heating & Plumbing Co. v. Data *101 Lease Fin. Corp., 302 So.2d 404, 407 (Fla. 1974))).

. Villareal also argues on appeal that the trial court erred in making certain evidentiary rulings, in ruling on his motion for new trial, ' and in denying his motion for remittitur. We find no merit to those arguments.