[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 20-11006

_____

D.C. Docket No. 8:17-cv-02354-TPB-SPF


HEATHER R. ERES,
individually, as Personal Representative of the
Estate of Kevin D. Bryant, deceased, and as
assignee of Eli Villareal a.k.a Elli Villareal
Alvarez,

                                                        Plaintiff-Appellant,


versus


PROGRESSIVE AMERICAN INSURANCE COMPANY,

                                                        Defendant-Appellee.


_____

Appeal from the United States District Court
for the Middle District of Florida

_____

(June 1, 2021)

Before JILL PRYOR, NEWSOM, and MARCUS, Circuit Judges.

NEWSOM, Circuit Judge:

This case requires us to decide whether, under Florida law, Progressive American Insurance Company acted in bad faith toward its insured when it failed to settle a claim with Heather Eres. After careful review and with the benefit of oral argument, we conclude that it did not. Quite the opposite, in fact. We affirm.

**I**

**A**

In May 2007, at a railroad crossing in Pasco County, Florida, an intoxicated driver, Eli Villareal Alvarez, slammed into Heather Eres's vehicle, propelling it into an oncoming train. Eres suffered permanent injuries in the crash, and her eight-year-old son, Kevin Bryant, was killed.

Villareal was arrested and charged with DUI manslaughter. Following nearly two years of criminal proceedings, Villareal pleaded guilty and was sentenced to 12 years' imprisonment.

Shortly after the accident, Villareal's insurer, Progressive, sought to settle matters quickly with Eres. The same day that Progressive learned of the accident—four days after it occurred—it determined that it should tender the full, $10,000 bodily-injury policy limits to both Eres and the estate of her son, for a total of $20,000. The next day, Progressive offered that amount to Eres's attorney, Frank Morse. Morse, though, told Progressive that Eres wasn't yet ready to receive the checks. He said that she needed to await the result of Villareal's

2

criminal proceedings and to resolve a dispute with her estranged husband about who would represent their son's estate. During the pendency of Villareal's criminal proceedings, Progressive's claims examiners consistently followed up with Morse, informing him that they were ready to disburse the checks at his direction.

On March 25, 2009, Progressive received a letter dated March 19 from Peter Macaluso, who had taken over Eres's representation. In the letter, Macaluso informed Progressive that following Villareal's guilty plea in his criminal case, Eres was ready to settle. Macaluso's letter contained a settlement offer—but, importantly for our purposes, the offer was conditioned on "strict compliance" with several requests. Specifically, Macaluso demanded that Progressive provide certain insurance-coverage information required by Florida law,[1] an affidavit from Villareal that he had no other insurance coverage, and $650 in reimbursement for Eres's son's personal belongings lost in the crash. Most critically here, Macaluso demanded that Progressive's acceptance release only the insured, Villareal, and expressly prohibited "hold harmless" and "indemnity" provisions: "[M]y clients cannot agree to a release which has a hold harmless or indemnity agreement in it."

---

[1] In relevant part, Fla. Stat. § 627.4137 requires an insurer, within 30 days of a written request, to provide "(a) The name of the insurer[;] (b) The name of each insured[;] (c) The limits of the liability coverage[;] (d) A statement of any policy or coverage defense which such insurer reasonably believes is available to such insurer at the time of filing such statement[;] (e) A copy of the policy."

3

Macaluso punctuated this point by repeating it: "Please understand providing us with any release containing anyone or any entity other than the insured, or a hold harmless indemnity agreement, would act as a rejection of this good faith offer to settle this matter." And he imposed a firm deadline for Progressive's response—"Good Friday (Friday before Easter)," *i.e.*, April 10, 2009.

Two days after receiving the letter, Susan Winkler, Progressive's claims examiner assigned to the case, internally requested a check for $20,000. Progressive also retained outside counsel, Katherine Shadwick, to represent Villareal and to assist in responding to Macaluso's demand. Winkler met with Progressive's in-house counsel, Robert Flayman, and together, they drafted a response. Shadwick reviewed the draft.

In the response, which was dated April 8 and delivered the same day, Winkler enclosed a full policy disclosure, a draft check for $20,000, payment for Eres's son's personal belongings, and proposed releases naming only Villareal. The releases also reserved Eres's right to pursue and recover future health and medical expenses from other responsible parties. Importantly, though, the reservation included a caveat: "[S]aid reservation does not include the party(ies) released who is/are given a full and final release of all claims, *including, but not limited to, past, present, or future claims for subrogation* arising out of the above-referenced accident." Shadwick separately sent Macaluso a letter with a copy of

4

Villareal's original signed affidavit of insurance coverage.  She stated: "[M]y client and Progressive have satisfied all conditions of your demand at this time.  If you disagree and require anything further, please advise immediately so that I may work diligently to timely address the issue."

Macaluso did disagree.  In a letter dated April 14—four days after the Good Friday deadline—he replied that he viewed Progressive's release as a rejection of his settlement offer:

> I had specifically written that a condition to settle the case was that Progressive would not attempt to provide my clients with a release containing a hold harmless or an indemnity agreement. . . .  Despite this requirement you provided me a release which would have released your insured for all claims (not merely my client's claims) including but not limited to past, present or future claims for subrogation arising out of the above referenced accident.

Progressive received Macaluso's letter on April 20, and Winkler responded two days later.  She disagreed with Macaluso's charge that the proposed releases "in some way contained hold harmless or indemnity requirements."  But in any event, she emphasized that the proposed releases had requested that Macaluso "notify [her] if [he] require[d] changes to either release."  Winkler concluded: "If you are, for whatever reason, uncomfortable having your clients execute releases containing the [waiver-of-subrogation language], feel free to strike it from the releases."

Eres didn't respond, through Macaluso or otherwise; instead, she sued Villareal in state court.  At trial, she won a judgment for more than $10 million.

The Second District Court of Appeal affirmed. *Villareal v. Eres*, 128 So. 3d 93, 101 (Fla. Dist. Ct. App. 2013). In doing so, and as relevant here, the Second District rejected the argument that Progressive, acting on Villareal's behalf, had met all the terms of the offer and thus settled the claim. *Id.* at 99–100, 100 n.4. In particular, the court observed that although the "proposed releases do not use the terms 'hold harmless' or 'indemnification,'" the language releasing all claims for subrogation was "in the nature of a hold harmless or indemnification agreement." *Id.* at 100 n.4.

**B**

Seeking to collect on her judgment, Eres filed this third-party bad-faith action against Progressive in state court, which Progressive removed to federal court.[2] After some discovery, the parties filed cross-motions for summary judgment.

Eres moved for partial summary judgment. She claimed that the Second District's decision in *Villareal* collaterally estopped Progressive from arguing that it had no opportunity to settle Eres's claims within policy limits. Progressive moved for summary judgment, claiming that as a matter of law it didn't act in bad faith in handling Eres's claims against Villareal.

---

[2] We have subject-matter jurisdiction based on diversity of citizenship. *See* 28 U.S.C. § 1332(a), (c). Heather Eres is a citizen of Florida, as was her deceased son, Kevin Bryant, before his death; Progressive is incorporated and has its principal place of business in Ohio.

6

A magistrate judge recommended denying Eres's motion and granting Progressive's. With respect to Eres's motion, the magistrate judge noted that the Second District's decision turned on a question of contract interpretation and didn't decide the issue of bad faith. With respect to Progressive's motion, he concluded that no reasonable jury could find bad faith. For starters, he explained, Progressive "offered to tender the policy limits within five days of the accident and then proceeded to attempt to settle [Eres's] claims for almost two years." Then, when Progressive received Macaluso's letter, it "acted expeditiously and worked diligently with its insured to obtain all the documents and information requested by the April 10 deadline." In attempting to accept the settlement offer, Progressive requested that Eres notify it if she wanted changes to either release. And even after Macaluso responded that he viewed the letter as a rejection of his settlement offer, Progressive invited him to "strike through the wording in question." Considering the totality of the circumstances, the magistrate judge concluded, Progressive "acted with good faith and with due regard[] for the interests of its insured."

The district court adopted the magistrate judge's report and recommendation and granted Progressive summary judgment. Eres timely appealed.[3]

---

[3] We review the district court's grant of summary judgment de novo, viewing all facts and drawing all inferences in the light most favorable to Eres. *Strickland v. Norfolk S. Ry. Co.*, 692 F.3d 1151, 1154 (11th Cir. 2012). Summary judgment is appropriate where there is no genuine issue of material fact. *Id.*

## II

Florida courts have long recognized "the good faith duty insurers owe to their insureds in handling their claims." *Harvey v. GEICO Gen. Ins. Co.*, 259 So. 3d 1, 6 (Fla. 2018); *Boston Old Colony Ins. Co. v. Gutierrez*, 386 So. 2d 783, 785 (Fla. 1980).[4]  The law of bad faith governs insurers' compliance with that duty. *Harvey*, 259 So. 3d at 6–7.  "[B]ecause the insured 'has surrendered to the insurer all control over the handling of the claim, including all decisions with regard to litigation and settlement, . . . the insurer must assume a duty to exercise such control and make such decisions in good faith and with due regard for the interests of the insured.'"  *Id.* at 6 (quoting *Boston Old Colony*, 386 So. 2d at 785).  And although the duty is one that the insurer owes to the *insured*—here, one that Progressive owed to Villareal—Florida law authorizes a cause of action by which the *victim*—here, Eres—can sue the insurer directly for its bad-faith failure to settle on the insured's behalf.  *See Boston Old Colony*, 386 So. 2d at 785; *Thompson v. Com. Union Ins. Co. of New York*, 250 So. 2d 259, 264 (Fla. 1971) ("[W]e . . . hold that a judgment creditor may maintain suit directly against tortfeasor's liability insurer for recovery of the judgment in excess of the policy limits, based upon the . . . bad faith of the insurer in the conduct or handling of the suit.").

---

[4] In diversity cases, we apply the forum state's substantive law—here, Florida's. *Mesa v. Clarendon Nat'l Ins. Co.*, 799 F.3d 1353, 1358 (11th Cir. 2015).

The "critical inquiry" in a bad-faith action is "whether the insurer diligently, and with the same haste and precision as if it were in the insured's shoes, worked on the insured's behalf to avoid an excess judgment." *Harvey*, 259 So. 3d at 7. The answer depends on the "totality of the circumstances":

> This good faith duty obligates the insurer to advise the insured of settlement opportunities, to advise as to the probable outcome of the litigation, to warn of the possibility of an excess judgment, and to advise the insured of any steps he might take to avoid same. The insurer must investigate the facts, give fair consideration to a settlement offer that is not unreasonable under the facts, and settle, if possible, where a reasonably prudent person, faced with the prospect of paying the total recovery, would do so. Because the duty of good faith involves diligence and care in the investigation and evaluation of the claim against the insured, negligence is relevant to the question of good faith.

*Id.* at 6–7 (quoting *Boston Old Colony*, 386 So. 2d at 785).

Although bad faith is ordinarily a question for the jury, *id.* at 7, both this Court and Florida courts have granted summary judgment where "[t]here is no sufficient evidence from which any reasonable jury could have concluded that there was bad faith on the part of the insurer," *Boston Old Colony*, 386 So. 2d at 785; *see also Mesa v. Clarendon Nat'l Ins. Co.*, 799 F.3d 1353, 1359–60 (11th Cir. 2015). Here, there is none; Progressive didn't act in bad faith.

At bottom, we agree with the district court's endorsement of the magistrate judge's "detailed and well-reasoned factual findings and legal conclusions." The day that Progressive learned of the accident, it concluded that it should offer the

9

full bodily-injury policy limits to Eres and her son's estate.  And while Villareal's criminal proceedings were ongoing, Progressive stayed in touch with Eres, informing her that it was ready to settle at her discretion.  After receiving Macaluso's unilateral offer to settle, Winkler, Flayman, and Shadwick—Progressive's claims examiner, in-house counsel, and outside counsel, respectively—promptly moved to satisfy his time-limited demands.  Shadwick contacted the Columbia Correctional Institute, where Villareal was incarcerated, to obtain his affidavit.  Separately, she identified an insurance policy owned by Villareal's mother and sought to determine whether it provided additional coverage.  Winkler and Flayman agreed to pay the $650 for Eres's son's personal belongings.  On April 8, two days before the Good Friday deadline, Progressive sent its response to Macaluso.  The day after, Shadwick responded separately and attached Villareal's signed affidavit of insurance coverage.  And when Macaluso responded that he viewed the proposed release's reference to subrogation as a rejection of his settlement offer, Winkler told Macaluso to "feel free to strike [the disputed language] from the releases."  All of these actions show that Progressive "diligently, and with the same haste and precision as if it were in the insured's shoes, worked on the insured's behalf to avoid an excess judgment." *Harvey*, 259 So. 3d at 7.

Eres's bad-faith claim turns primarily on the contention that Progressive provided her an overbroad release that wasn't a mirror-image response to her demand, as required by Macaluso's letter. Under Florida law, an overbroad release can create a factual dispute regarding bad faith. *See, e.g.*, *United Auto. Ins. Co. v. Estate of Levine*, 87 So. 3d 782, 787–88 (Fla. Dist. Ct. App. 2011); *Otaola v. Cusano's Italian Bakery*, 103 So. 3d 993, 997 (Fla. Dist. Ct. App. 2012). And, Eres says, an overbroad release is precisely what Progressive sent her here. If Progressive's release had included express hold-harmless or indemnification language, Eres reasons, there would undoubtedly be a jury question regarding bad faith. The same result, she contends, follows from the subrogation language in Progressive's release, which she views as an only slightly less brazen means of achieving the same end.

Eres's argument suffers from two defects. First, Eres's singular focus on the allegedly overbroad release language ignores the "totality of the circumstances"—both what came before it and, perhaps even more importantly, what came after. While an overbroad release *can* create a jury question about bad faith, it doesn't necessarily do so. *See, e.g.*, *Cardenas v. GEICO Cas. Co.*, 760 F. Supp. 2d 1305, 1309–10 (M.D. Fla. 2011) (holding that there was no bad faith as a matter of law, despite an express hold-harmless provision in a proposed release contrary to the settlement offer). Here, given Progressive's offer to "strike" the offending

11

language, it's not clear to us that there would be a jury question regarding bad faith *even if* Progressive's release contained express hold-harmless language. Indeed, when federal courts have found a fact issue regarding bad faith based on overbroad release language, they have relied on the insurers' "refus[al] to remove the release's indemnification language." *See Maharaj v. GEICO Cas. Co.*, 996 F. Supp. 2d 1303, 1314–15 (M.D. Fla. 2014); *see also Gov't Emps. Ins. Co. v. Prushansky*, 2014 WL 47734, at \*10 (S.D. Fla. Jan. 7, 2014).

Second, and more importantly, Progressive's release didn't include express hold-harmless language. *See Martin v. Allstate Prop. & Cas. Ins. Co.*, 794 F. App'x 883, 888 (11th Cir. 2019) (holding that even if an insurer's proposed release constituted a rejection of the plaintiff's offer, the totality of the evidence did not support a finding of bad faith because, among other things, the insurer "did not retain *obviously problematic* language such as a hold harmless clause" (emphasis added)).[5] Eres has not identified, nor have we found, a Florida case decided before April 2009—when Progressive sent Eres the proposed releases—purporting to settle the question whether a waiver-of-subrogation clause is "in the nature of" a hold-harmless or indemnification provision. And although the Second District ultimately resolved that question in Eres's favor in the course of this litigation,

---

[5] Of course, as an unpublished case, *Martin* isn't binding on us, but we find it on point and persuasive.

Progressive lacked the benefit of that decision when it responded to Eres's offer in the spring of 2009, so it can't form the basis of her bad-faith claim now. *See Villareal*, 128 So. 3d at 100 n.4 (citing a case from 2012 to support the proposition that a waiver-of-subrogation clause is "in the nature of" a hold-harmless provision).[6] Because the answer to the bad-faith question turns in part on what a "reasonably prudent person" would do under the circumstances, and a reasonably prudent person in Progressive's shoes wouldn't necessarily have known circa April 2009 that a waiver-of-subrogation clause was tantamount to a hold-harmless or indemnity provision, no reasonable jury could have found bad faith here. *Harvey*, 259 So. 3d at 6–7.[7]

---

[6] Eres says that the *Villareal* decision collaterally estops Progressive from arguing "(i) that it complied with the terms of Eres's offer and (ii) that it could not have settled her claims even if it had provided a conforming release." We agree that *Villareal* held that Progressive's response failed to accept Eres's offer, and Progressive can't relitigate that issue here. But that point doesn't aid Eres. Progressive doesn't argue that it complied with Eres's offer or that it lacked an opportunity to settle; it contends instead that *despite* its rejection of Eres's initial settlement offer, it didn't act in bad faith.

[7] Perhaps recognizing this problem, Eres contends that her argument "does not rely solely" on the Second District's decision. Rather, she says, the "*Villareal* decision . . . confirms what the evidence shows Progressive should have appreciated in 2009." To the extent that Eres's argument is that a reasonably prudent person should have known that a waiver-of-subrogation provision was tantamount to a hold-harmless or indemnity provision before *Villareal*, we disagree. In ultimately holding that a waiver of subrogation is "in the nature of" a hold-harmless provision—for the limited purpose of deciding whether Progressive accepted Macaluso's settlement offer—the Second District didn't suggest that Progressive's argument to the contrary was meritless or frivolous. *See Villareal v. Eres*, 128 So. 3d 93, 99–100, 100 n.4 (Fla. Dist. Ct. App. 2013). Nor do we find that it was—this Court, in a related context, has consistently distinguished subrogation waivers from hold-harmless clauses. *See Fluor Western, Inc. v. G&H Offshore Towing Co.*, 447 F.2d 35, 39–40 (5th Cir. 1971); *see also In re Johnson*, 2006 WL 126613, at *3, *3 n.5 (S.D. Ala. Jan. 17, 2006) (collecting maritime cases and explaining that "while a true exculpatory clause precludes the defendant's liability for its own negligence, a

13

The other record facts that Eres contends evince bad faith don't compel a different conclusion.  First, Eres highlights Progressive's failure initially to appreciate the significance of the "strict compliance" language in Macaluso's letter.  Although Winkler identified the other demands set forth in the letter, she didn't flag the "strict compliance" language for Flayman and Shadwick.  Second, Eres asserts that both Flayman and Shadwick carelessly approved the releases.  Flayman, she says, performed only a "perfunctory review" of the form release that he'd used "tens of thousands of times," and Shadwick spent "less than a half-hour" reviewing the form.  Those facts, Eres says, are made all the more relevant by the testimony of her insurance-industry expert, George Vaka, who opined that Progressive's failure to "rule[] out the possibility that this response could be deemed a counteroffer" was inconsistent with the standard of care that a reasonably prudent insurance adjuster would meet.

At worst, however, these facts show some negligence—but nothing approaching bad faith.  Our decision in *Mesa v. Clarendon National Insurance Co.*, 799 F.3d 1353 (11th Cir. 2015), is illustrative.  There, we acknowledged that the insurer might have been negligent in failing to keep its insured advised of

---

waiver-of-subrogation clause leaves the defendant's potential liability intact but reduces its exposure to those losses not covered by the plaintiff's insurance").  Because reasonable minds could differ on this issue, we reject Eres's contention that a reasonably prudent person would necessarily have known that by including the waiver of subrogation Progressive would render its response a "readily perceptible non-conforming and expansive release."

settlement opportunities—a fact that Florida courts had expressly declared to be relevant to bad faith. *Id.* at 1360; *see also Harvey*, 259 So. 3d at 6–7. We nonetheless affirmed summary judgment for the insurer, explaining that the record "demonstrate[d] at best a need for [the insurer] to augment its claims practices, not that [its] actions rose to the level of bad faith." *Mesa*, 799 F.3d at 1360. So too here—Eres has identified some ways that Progressive might improve its claims-processing practice, but it isn't clear that Eres has shown negligence, let alone bad faith. On the undisputed facts, Eres has raised no possible inference of bad faith.

\* \* \*

For the foregoing reasons, we **AFFIRM**.