[DO NOT PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 21-12159

Non-Argument Calendar

_____

JONATHAN ELLIS,

Plaintiff-Appellant,

JOYCE BROBECK,
as Personal Representative of the Estate of Timothy Brobeck,

Plaintiff,

*versus*

GEICO GENERAL INSURANCE COMPANY,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Southern District of Florida
D.C. Docket No. 0:19-cv-61611-WPD

_____

Before JORDAN, NEWSOM, and BLACK, Circuit Judges.

PER CURIAM:

Jonathan Ellis appeals the district court's grant of summary judgment to GEICO General Insurance Company in Ellis's bad faith action against GEICO. Ellis filed an action for declaratory relief in Florida state court asking the court to determine whether GEICO should be held responsible for an excess judgment against Ellis in a wrongful death case brought by Joyce Brobeck, the personal representative of the Estate of Timothy Brobeck. Upon removal to federal district court, the court found that under the undisputed facts of the case, no reasonable jury could conclude that GEICO operated in bad faith in its handling of Ellis's claim. After review,[1] we affirm.

---

[1] "We review the district court's grant of summary judgment de novo, viewing all facts and drawing all inferences in the light most favorable" to Ellis. *Eres v. Progressive Am. Ins. Co.*, 998 F.3d 1273, 1278 n.3 (11th Cir. 2021). In diversity cases, we apply the substantive law of the forum state, which in this case is Florida law. *See Palaez v. GEICO*, 13 F.4th 1243, 1249 (11th Cir. 2021). "Although bad faith is ordinarily a question for the jury, both this Court and Florida courts have granted summary judgment where there is no sufficient

## I.  BACKGROUND

This case arises out of a car accident involving Ellis and Timothy Brobeck, resulting in Brobeck's death.  On September 7, 2014, Ellis struck the rear of Brobeck's bicycle and fled.  At the time of the accident, Ellis was insured by GEICO under an automobile liability insurance policy which provided bodily injury liability coverage in the amount of $10,000 per person and $20,000 per accident.  Subsequent to the accident, Joyce Brobeck, as personal representative of Timothy Brobeck, filed suit against Ellis.  Brobeck's estate ultimately received a final judgment against Ellis for $479,280.56.  On May 21, 2019, Ellis filed this declaratory action against GEICO, seeking a declaration that GEICO had handled the Estate of Brobeck's claim against Ellis in bad faith.[2]

After fleeing the scene of the accident, Ellis hired a lawyer on September 8, and he was arrested on September 10.  Ellis remained in jail until September 22, and upon release, obtained a new cellphone with a different number because the police did not return his previous cellphone.  Ellis also stayed in the homes of a friend or his uncle because he did not want to be alone and did not have the mail forwarded from his apartment.  Ellis was advised by

_____

evidence from which any reasonable jury could have concluded that there was bad faith on the part of the insurer." *Eres*, 998 F.3d at 1278 (quotation marks and citation omitted).

[2] This suit was originally filed by Ellis against Joyce Brobeck as personal representative of the Estate of Brobeck and GEICO; however, the district court realigned the parties in an Order entered on December 2, 2019.

his criminal defense attorney not to talk with anyone about the accident, which Ellis believed included GEICO.

Brobeck was survived by his mother, Joyce, his wife Laura, and their 16-year-old daughter, Barbara, who has cerebral palsy. Laura hired Fort Lauderdale lawyer Hyram Montero to represent Timothy's estate, but Joyce served as personal representative because Laura lived in Argentina.[3]  Montero was unable to obtain a copy of the Florida Traffic Crash Report because the Fort Lauderdale Police Department (FLPD) was conducting a Traffic Homicide Investigation, but his team found a news article about the accident.  Montero went to the FLPD and was provided with the hit and run driver's name, his insurance company, and policy number.

On September 16, 2014, Montero instructed his receptionist, Rosemary Gomez, to send a letter of representation to GEICO.  On October 9, 2014, Montero asked Gomez to call GEICO because it had not responded to the letter.  Gomez complied and provided GEICO with the information in the news article.  GEICO's claim activity log for October 9 shows Gomez told GEICO that Brobeck was a bicyclist who died of his injuries, Ellis fled from the scene of the accident, Ellis was arrested a few days later when he went to the police department to claim his car, and a document referred to as a "complain[t] affidavit" showed when Ellis was arrested. Gomez informed Montero that GEICO claimed it had not received

---

[3] Laura and Barbara had moved to Argentina before the accident occurred so that Laura could take care of her parents after her mother had a heart attack.

the September 16 letter of representation, and Gomez sent GEICO a new letter of representation by fax.

On October 9, GEICO assigned the case to adjuster Bobbie Harney, who attempted to contact Ellis and Montero on October 9, and was unable to reach either. Harney, however, left a voicemail for Ellis and mailed a first contact letter and a reservation of rights letter that day. On October 10, Montero's office told Harney that Brobeck was thrown from his bike when Ellis struck it from the rear. Because Harney was unable to reach Ellis by telephone, she met with her supervisor, John Smith, and they decided to enlist the assistance of a field adjuster to locate Ellis.

On October 12, Harney again unsuccessfully tried to contact Ellis and left a voicemail. On October 13, Ann Sholar was assigned as the field investigator to locate Ellis. Sholar performed a Google search and found a news article about the accident. On October 13, Harney again tried to contact Ellis but could not reach him. Harney left a voicemail with Ellis and tried to locate updated contact information for Ellis.

On October 15, Sholar attempted to visit Ellis's place of employment, Stache's, but did not enter the building due to safety concerns as it was a windowless building named "Himmie Health Club." Sholar also attempted to visit Ellis's residence, but the apartment was empty. Sholar left a GEICOgram at Ellis's residence requesting he contact GEICO. Sholar also received a return call from FLPD that day with Ellis's case number, a confirmation that Ellis was out on bail, and the phone number the FLPD had for Ellis.

On October 16, Harney unsuccessfully attempted to contact Ellis at two phone numbers and left voicemails at both. On October 17, Sholar called the FLPD and discovered it had Ellis's traffic citation, but not the Florida Traffic Crash Report. Sholar did not request or follow up on Ellis's traffic citation at that time.

On October 20, Harney again tried to contact Ellis on both numbers she had for him, but she was unable to reach him and left voicemails. On October 21, Sholar contacted the FLPD to obtain the Florida Traffic Crash Report but was informed the officer responsible for the report was not in that day. That same day GEICO received a voicemail advising that Officer Jill Hirsch was handling the investigation. GEICO returned the call and left a voicemail regarding the Florida Traffic Crash Report.

On October 22, Harney asked Montero for a copy of the Florida Traffic Crash Report. On that same day, GEICO again sent a reservation of rights letter to Ellis, noting his delay in reporting the loss may prejudice GEICO's investigation of the claim. On October 23, Sholar again contacted FLPD to request a copy of the Florida Traffic Crash Report and was once again told that the report was not available.

On October 27, Sholar received notice that the Florida Traffic Crash report was available at the FLPD. On October 29, at 9:35 a.m., GEICO finally obtained a copy of the Florida Traffic Crash Report. Within minutes of the receiving the report, Smith and Harney met and decided to tender Ellis's full bodily injury limits to Brobeck based on confirmation that Ellis's vehicle was involved in

the loss, and following the meeting, Harney immediately updated the claim to list Ellis as 100% at fault.  At the same time, GEICO dispatched Sholar to hand deliver a check for the policy limits and an accompanying release to Montero's office.  GEICO also sent a letter to Ellis advising him of the possibility of a judgment in excess of his policy limits, his right to hire his own counsel, that GEICO would provide him a defense if suit were filed, and of Ellis's right to contribute toward the settlement of the claim.

On November 11, 2014, GEICO received a letter from Montero rejecting the tender of the policy limits as untimely.  Montero considered any tender after October 16, 2014 untimely, but would have provided GEICO a grace period through October 22, 2014, when GEICO provided him a verification of coverage.  Montero's opinion is that GEICO did not act in good faith towards Ellis and did not treat this case with the urgency it required because it failed to follow up on leads that would have enabled it to make a timely tender of policy limits. Montero faulted GEICO for failing to obtain the VIN and tag numbers from the wrecker company that towed the accident vehicle, failing to obtain the Complaint Affidavit, failing to obtain the traffic citation, failing to enter Ellis's place of employment because of the unjustified fear that it was unsafe, failing to act on leads because of scheduling conflicts, and failing to go to the police department in person.

## II. DISCUSSION

### A. Florida bad faith law

Florida courts have long recognized "the good faith duty insurers owe to their insureds in handling their claims." *Harvey v. GEICO Gen. Ins. Co.*, 259 So. 3d 1, 6 (Fla. 2018); *Boston Old Colony Ins. Co. v. Gutierrez*, 386 So. 2d 783, 785 (Fla. 1980). "[B]ecause the insured 'has surrendered to the insurer all control over the handling of the claim, including all decisions with regard to litigation and settlement, . . . the insurer must assume a duty to exercise such control and make such decisions in good faith and with due regard for the interests of the insured.'" *Harvey*, 259 So. 3d at 6 (quoting *Boston Old Colony*, 386 So. 2d at 785). "An insurer, in handling the defense of claims against its insured, has a duty to use the same degree of care and diligence as a person of ordinary care and prudence should exercise in the management of his own business." *Boston Old Colony*, 386 So. 2d at 785.

> This good faith duty obligates the insurer to advise the insured of settlement opportunities, to advise as to the probable outcome of the litigation, to warn of the possibility of an excess judgment, and to advise the insured of any steps he might take to avoid same. The insurer must investigate the facts, give fair consideration to a settlement offer that is not unreasonable under the facts, and settle, if possible, where a reasonably prudent person, faced with the prospect of paying the total recovery, would do so.

*Id.* (citations omitted).

21-12159                Opinion of the Court                9

"Breach of this duty may give rise to a cause of action for bad faith against the insurer." *Perera v. U.S. Fid. & Guar. Co.*, 35 So. 3d 893, 898 (Fla. 2010). Where "liability is clear, and injuries so serious that a judgment in excess of the policy limits is likely, an insurer has an affirmative duty to initiate settlement negotiations." *Harvey*, 259 So. 3d at 7 (quotation marks omitted). "In such a case, where the financial exposure to the insured is a ticking financial time bomb and suit can be filed at any time, any delay in making an offer . . . even where there was no assurance that the claim could be settled could be viewed by a fact finder as evidence of bad faith." *Id.* (quotation marks and alterations omitted).

"[T]he question of whether an insurer has acted in bad faith in handling claims against the insured is determined under the 'totality of the circumstances' standard." *Berges v. Infinity Ins. Co.*, 896 So. 2d 665, 680 (Fla. 2004). "[T]he critical inquiry in a bad faith action is whether the insurer diligently, and with the same haste and precision as if it were in the insured's shoes, worked on the insured's behalf to avoid an excess judgment." *Harvey*, 259 So. 3d at 7. While "negligence is not the standard" for evaluating bad faith actions, *id.* at 9, "[b]ecause the duty of good faith involves diligence and care in the investigation and evaluation of the claim against the insured, negligence is relevant to the question of good faith," *Boston Old Colony*, 386 So. 2d at 785. The focus of the bad faith case is on the actions of the insurer, not those of the claimant. *Berges*, 896 So. 2d at 677. For that reason, a claimant's "actions can[not] let the insurer off the hook when the evidence clearly establishes

that the insurer acted in bad faith in handling the insured's claim." *Harvey*, 259 So. 3d at 11.

## B. *GEICO did not operate in bad faith*

Ellis contends the district court erred in granting summary judgment to GEICO because the record contains sufficient evidence from which a reasonable jury could conclude GEICO acted in bad faith in the handling of the Estate of Brobeck's wrongful death claim against Ellis. Because the case was a ticking financial time bomb with aggravated liability, big damages, and low insurance policy limits, GEICO was required to take a proactive role to settle the case within policy limits. Ellis asserts with the information GEICO had—Ellis's arrest and traffic citation, a news article, a telephone conversation with FLPD, and the location of the towing company where Ellis's vehicle was towed—coverage could have been verified within days after notice of the Brobeck claim. Instead, GEICO needlessly prolonged its investigation by waiting until it could obtain a copy of the Florida Traffic Crash Report when GEICO knew the release of police reports are delayed when a fatality occurs. Ellis contends under these circumstances, a reasonable jury could find that GEICO did not act with the same degree of care and diligence as a person of ordinary care and prudence should exercise with the management of his own business, or that GEICO diligently, and with the same haste and precision as if it were in Ellis's shoes, worked on his behalf to avoid an excess judgment.

While Ellis points to speculative, alternative investigatory avenues that GEICO's adjusters could have explored in the time period between October 9 and October 29, Ellis overlooks the efforts GEICO did take to investigate the claim and confirm coverage. Given the undisputed facts of this case, we agree with the district court that no reasonable jury could conclude that GEICO operated in bad faith under the totality of the circumstances. Upon receiving late notice of the accident on October 9, 2014, GEICO immediately began its investigation and was diligent in its investigation. However, despite its efforts to investigate the loss, GEICO was unable to determine to what extent Ellis and his vehicle were involved in the loss until GEICO obtained the Florida Traffic Crash Report on October 29, 2014. The Florida Traffic Crash Report contained Ellis's vehicle identification number, which allowed GEICO to confirm Ellis's vehicle was involved in the loss. Once GEICO knew there was coverage upon receiving the Florida Traffic Crash Report on October 29, 2014, it immediately extended coverage for the loss, apportioned 100% liability on Ellis, and immediately tendered the policy limits.

GEICO's efforts in timely confirming coverage were frustrated by Ellis's lack of communication. While GEICO's actions, not Ellis's, are the focus of the bad faith case, Ellis's lack of communication with GEICO can be considered when determining the totality of the circumstances. *See Berges*, 896 So. 2d at 677, 680. The same day it received notice of the accident, GEICO attempted to discuss the loss with Ellis and left a voicemail. Ellis did not respond

or return GEICO's call.  GEICO attempted to contact Ellis repeatedly during the next 20 days and left multiple voicemail messages for Ellis to confirm his involvement.  GEICO also sent Ellis multiple letters.  None of GEICO's attempts to communicate received a response.

GEICO also made other attempts to verify coverage.  On October 13, GEICO assigned a field representative to assist in locating Ellis and obtaining a copy of the police report.  Over the next 16 days, Sholar communicated with FLPD on many occasions.  Sholar also visited Ellis's alleged place of employment, although she did not enter for safety concerns.  She then attempted to visit Ellis's residence, and Ellis's apartment was empty.  Sholar left a GEICOgram at Ellis's residence requesting he contact GEICO as "there has been a report of an accident involving an injury to another."

An insurer—acting with diligence and due regard for its insured—is allowed a reasonable time to investigate a claim; no obligation exists to tender policy limits in advance of a settlement offer without time for investigation.  *See Boston Old Colony*, 386 So. 2d at 785 (explaining part of good faith duty is obligation of insurer to investigate the facts); *De Laune v. Liberty Mut. Ins. Co.*, 314 So. 2d 601, 603 (Fla. 4th DCA 1975) (recognizing the right to first make an inquiry and evaluate merits of a claim before obligation to settle is triggered).  Even if one of Ellis's alternate avenues of confirming coverage would have done so more quickly, under the totality of the circumstances, a reasonable jury could not say GEICO was not

acting diligently and with the same haste and precision as if they were in the insured's shoes.

## III.  CONCLUSION

On the undisputed facts, Ellis has raised no possible inference of bad faith.  *See Eres*, 998 F.3d at 1281. We affirm the district court.

**AFFIRMED.**