[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 20-12053

_____

D.C. Docket No. 8:19-cv-00910-JSM-JSS


RAUL A. PELAEZ,
as Limited Guardian of the Person and
Property of John Poul Pelaez, ward, and
Michael Adam Conlon, Jr.,

                                        Plaintiff - Appellant,

versus

GOVERNMENT EMPLOYEES INSURANCE COMPANY,

                                        Defendant - Appellee.

_____

Appeal from the United States District Court
for the Middle District of Florida
_____

(September 20, 2021)

Before BRANCH, GRANT, and ED CARNES, Circuit Judges.

ED CARNES, Circuit Judge:

This is a Florida bad faith insurance case.  The insurer promptly offered to settle a bodily injury claim for the $50,000 policy limits.  Pointing to overbroad language in a suggested release form, which the insurer made clear it was willing to modify, the claimant appeals from the district court's rejection of his attempt to obtain a $14,900,000 bad faith judgment from the insurer.

## I.

On April 13, 2012, Michael Conlon had just turned eighteen and was driving his mother's car to the high school prom when he turned into a median and in front of John Pelaez who was on a motorcycle.  The motorcycle hit Conlon's car with such force that it spun the car 180 degrees, and the impact injured Pelaez seriously enough that he was airlifted to the hospital.  GEICO had issued Conlon's mother a policy covering her car and Conlon as an additional driver.  From the scene, Conlon reported to GEICO that there had been an accident damaging the car and it needed to be towed. He didn't report at that time there had been any injuries.

On April 16, which was the next business day, GEICO assigned a claims adjuster to the incident and also received information about how to contact two detectives who were investigating the crash.  On April 17 GEICO interviewed Conlon, who suggested Pelaez may have been speeding.  He also disclosed for the first time that Pelaez had been injured, rendered unconscious, and airlifted to a hospital.  On April 18 GEICO learned the speed limit in the crash area was low (35

2

miles per hour), the skid marks left by the motorcycle were long (67 feet), and Conlon had not been cited for the accident. Those three facts led GEICO to preliminarily conclude that Pelaez likely had been speeding and was contributorily negligent.

On April 23, which was ten calendar days after the crash and seven days after GEICO assigned an adjuster to work the claim, it received a letter of representation from Pelaez's attorney. The letter requested certain statutory insurance disclosures but did not make any settlement demands. That same day GEICO received from Conlon's mother photos of the crash scene, and it received from Pelaez's fiancée a copy of the police report about the crash. The police report indicated Conlon had failed to yield the right of way, a witness had reported Pelaez didn't appear to be speeding, and Pelaez had suffered head and other major injuries.

On April 24, the very next day and only eleven days after the crash, GEICO decided to proactively tender to Pelaez its bodily injury policy limit of $50,000, even though it had not received a settlement demand from Pelaez's attorney. On April 25, less than two weeks after the accident, GEICO's claims adjuster called Pelaez's attorney's office to offer the bodily injury policy limit and ask that GEICO be allowed to inspect the motorcycle so that the company could make an offer on the property damage claim for the motorcycle.

3

The next day, April 26, which was thirteen calendar days (nine business days) after the accident, a GEICO field adjuster hand delivered to Pelaez's attorney's office a bodily injury claim "tender package."  The package contained: a cover sheet that listed the package's contents and described an enclosed check as "representing tender of the per person policy limit under Bodily Injury Liability coverage"; a $50,000 check inscribed with the notation "[t]ender of per person BI limits"; and a proposed form release of "all claims."  The package also contained two letters from GEICO's claims adjuster to Pelaez's attorney. One letter set out the insurance policy's relevant details, including the fact that there were two separate $50,000 coverage limits, one for bodily injury and another for property damage.

The other letter in the tender package was also from the claims adjuster to the attorney.  It discussed the release.  The proposed form release in the package was titled "Release of All Claims" and purported to release Conlon and his mother (the named insured) "from any and all claims, demands, damages, actions, causes of action, or suits of any kind or nature whatsoever, on account of all injuries and damages, known and unknown, which have resulted or may in the future develop as a consequence of" the crash.  The accompanying letter from the claims adjuster to Pelaez's attorney explained that "[n]ot all release forms precisely fit the facts

4

and circumstances of every claim" and asked Pelaez's attorney to call "immediately" if he had "any questions about any aspect of the release."

That letter also invited Pelaez's attorney to edit the release by sending GEICO "any suggested changes, additions or deletions with a short explanation of the basis for" them or, if he preferred, to send GEICO an entirely new release of his choosing. The letter made this request of Pelaez's attorney concerning the proposed release: "If you feel that there is any aspect of the enclosed document, which does not reflect our settlement of your claim(s), please contact me immediately so that we can see that the document is revised to reflect the exact terms of our agreement."

On April 27, which was a Friday and the day after the tender package had been delivered to him, Pelaez's attorney wrote to GEICO's claims adjuster. His letter noted (again) his representation of Pelaez and asked (again) for statutorily required disclosures. It also acknowledged GEICO's desire to inspect the motorcycle. The attorney agreed to cooperate with that but stated he couldn't give "unilateral access" to the motorcycle because he was "evaluating a product liability action." His letter asked who from GEICO would be attending the inspection of the motorcycle and when they would be available, but he didn't disclose its location other than saying it was "being held locally."

One thing that the attorney's April 27 letter didn't do is respond to the tender package or GEICO's offer of settlement. Or to the invitation for him to suggest changes to the proposed release or submit one himself. He didn't even mention GEICO's settlement offer or proposed release.

GEICO received that letter from Pelaez's attorney the following Monday, April 30. Throughout the remainder of that week, GEICO tried to find out through Pelaez's attorney where the motorcycle was so that it could complete an estimate and adjust the property damage claim. Pelaez's attorney steadfastly avoided disclosing where the motorcycle was. But at the end of the week, on Friday, May 4, he wrote to GEICO and rejected the $50,000 tender of the full policy limits on the bodily injury claim.

In his letter rejecting the settlement offer, Pelaez's attorney told GEICO that Pelaez and his parents had decided to sue Conlon and his mother instead of settling because GEICO had tried to take advantage of the Pelaez family with an overbroad release. He noted the "GEICO approved form release" was for "all claims" instead of just "the claims that [GEICO was] paying for" because it didn't contain a "reservation for property damage," despite GEICO's sophistication and ability to draft narrower release language. He explained that the Pelaez family would've accepted the policy limits to release the bodily injury claim if GEICO had offered "the proper insurance benefits" — a $50,000 check and a bodily injury only release

6

— but that the family was rejecting the tender offer because GEICO was "requiring them to execute a release of <u>all</u> claims in exchange for payment of <u>less than all</u> of the insurance benefits owed."

In his letter the attorney relayed the family's "scorn, opprobrium and contempt" at what they suspected was "a wide spread practice of GEICO [trying] to increase profits by compromising the rights of consumers." Implicitly acknowledging GEICO's invitation for the attorney to revise the form release or send an alternative one of his own, he noted the family would not "[s]ettl[e] on a more limited release." He explained that agreeing to settle using a proper release would "allow GEICO to prey on the next accident victim." So instead of settling for the full bodily injury policy limit the Pelaez family had decided to sue Conlon and his mother and "take every action necessary to . . . bring to light the way that GEICO unfairly does business."

GEICO received the rejection letter the following Monday, May 7, and on May 8 told Conlon's mother its efforts to settle with Pelaez had been unsuccessful. On May 9[1] GEICO responded to the rejection letter, expressing confusion about why the Pelaez family and their attorney thought its tender of the $50,000 bodily

---

[1] Also on May 9, Pelaez's attorney faxed GEICO an offer to settle the bodily injury claim against Conlon's mother for the $50,000 policy limit but reserving all claims against Conlon or any "other potentially responsible" party. Under the terms of that offer, it expired ten business days later. During those ten business days, GEICO had tried unsuccessfully to get Pelaez's attorney to explain why his offer didn't include releasing Conlon. (Because Conlon was an additional insured under the policy, GEICO owed him the same duty it owed his mother.)

7

injury policy limit also included the property damage claim when the company had

"made multiple attempts" by phone and in writing "to ascertain the location" of

Pelaez's motorcycle so that it could estimate the damage and adjust that claim but

had never "received a call back with the motorcycle's location" or even any

acknowledgement of its "communication attempts."  GEICO explained that its

practice was to keep bodily injury claims and property damage claims separate and

that its "policy contract also outlines this."  GEICO reiterated that the release was

"a proposed release" and again invited Pelaez's attorney to send "additional

language or changes" for the release.  And GEICO reminded Pelaez's attorney that

it was still "awaiting the location" of the motorcycle so it could "complete an

estimate and resolve the Property Damage claim."

Five months after the crash the Pelaez family[2] sued Conlon and his mother

for negligence in Florida state court, and GEICO hired an attorney to defend them.

A month after that, Pelaez and GEICO agreed to settle the property damage claim

for $7,283.06.[3]  Three-and-a-half years later, while the negligence litigation was

---

[2] Because John Pelaez is a ward, the lawsuit was filed by John's mother Patricia and by his father Raul.  Patricia and Raul each sued Conlon and his mother, and Raul also sued Conlon and his mother as limited guardian of John's person and property.

[3] In a letter dated May 14, 2012, Pelaez's attorney told GEICO that the motorcycle inspection would take place on June 25, and GEICO replied on May 25 to ask if the inspection could happen any earlier.  The record doesn't reflect when the actual inspection occurred, but Pelaez's attorney told GEICO on October 25, 2012 that Pelaez agreed to accept $7,283.06 to settle the property damage claim.  The claim was ultimately settled for that amount in May 2013.

ongoing, GEICO declined to enter a stipulated judgment with the Pelaez family, Conlon, and Conlon's mother. The record does not reveal why it declined but the reason is obvious. A stipulated judgment involving those parties would be a way to obtain an excess judgment that could be used in a bad faith lawsuit against GEICO. GEICO also objected to Conlon and his mother entering a stipulated judgment with the Pelaez family and warned the law firm representing Conlon and his mother that if they "enter[ed] into such an agreement against Geico's wishes, Geico reserve[d] the right to raise any policy defenses available to it."

Nearly two years after that, on the fifth day of the negligence trial involving the collision, the court entered a final judgment that Pelaez and Conlon had consented to. The judgment awarded Pelaez $14,900,000 against Conlon but stipulated that Pelaez "shall not" record the judgment or try to collect it from Conlon; instead, Pelaez would "seek satisfaction . . . solely from insurance proceeds, including from claims of 'bad faith' or extra-contractual damages." GEICO was not represented at the trial and was not a party to the stipulated judgment, but Pelaez's attorneys testified that GEICO had agreed to let Conlon enter the stipulated judgment and that Pelaez wouldn't have signed the judgment if GEICO hadn't agreed.[4]

---

[4] In a separate agreement on January 4, 2018, Pelaez also settled with Conlon's mother for the GEICO policy's $50,000 bodily injury claim limit. The same amount that GEICO had offered nearly six years earlier.

Pelaez and Conlon then brought common law bad faith claims against GEICO in Florida state court, and GEICO removed the lawsuit to federal court. Both sides moved for summary judgment. The district court granted it to GEICO on two grounds, one of which was that no reasonable jury could conclude GEICO had acted in bad faith.[5] This is Pelaez's appeal.

## II.

"We review the district court's grant of summary judgment de novo, viewing all facts and drawing all inferences in the light most favorable to" the nonmoving party. Eres v. Progressive Am. Ins. Co., 998 F.3d 1273, 1278 n.3 (11th Cir. 2021). "In diversity cases, we are required to apply the substantive law of the forum state; here, Florida." Mesa v. Clarendon Nat'l Ins. Co., 799 F.3d 1353, 1358 (11th Cir. 2015); see also GEICO v. Grounds, 332 So. 2d 13, 14–15 (Fla. 1976) (noting that Florida law applies to bad faith insurance actions brought in Florida).

"It has long been the law of [Florida] that an insurer owes a duty of good faith to its insured." Berges v. Infinity Ins. Co., 896 So. 2d 665, 672 (Fla. 2004). The duty has been well-defined for more than 40 years, since the Florida Supreme

---

[5] For its other ground, relying on one of our unpublished opinions, the district court held that the stipulated judgment did not qualify as an excess judgment, which is generally required for a bad faith claim. See Cawthorn v. Auto-Owners Ins. Co., 791 F. App'x 60 (11th Cir. 2019). Because we agree that, as a matter of law, GEICO did not act in bad faith, we have no occasion to address that alternative basis for granting summary judgment to GEICO.

Court described it in Boston Old Colony Ins. Co. v. Gutierrez, 386 So. 2d 783 (Fla.

1980):

> An insurer, in handling the defense of claims against its insured, has a duty to use the same degree of care and diligence as a person of ordinary care and prudence should exercise in the management of his own business. For when the insured has surrendered to the insurer all control over the handling of the claim, including all decisions with regard to litigation and settlement, then the insurer must assume a duty to exercise such control and make such decisions in good faith and with due regard for the interests of the insured. This good faith duty obligates the insurer to advise the insured of settlement opportunities, to advise as to the probable outcome of the litigation, to warn of the possibility of an excess judgment, and to advise the insured of any steps he might take to avoid same. The insurer must investigate the facts, give fair consideration to a settlement offer that is not unreasonable under the facts, and settle, if possible, where a reasonably prudent person, faced with the prospect of paying the total recovery, would do so.

Id. at 785; see also, e.g., Harvey v. GEICO Gen. Ins. Co., 259 So. 3d 1, 6–7 (Fla.

2018) (quoting Boston Old Colony to define the duty); Kropilak v. 21st Century

Ins. Co., 806 F.3d 1062, 1067–68 (11th Cir. 2015) (same).  "Breach of this duty

may give rise to a cause of action for bad faith against the insurer."  Perera v. U.S.

Fid. & Guar. Co., 35 So. 3d 893, 898 (Fla. 2010).  Florida's bad faith law is

"designed to protect insureds who have paid their premiums and who have fulfilled

their contractual obligations by cooperating fully with the insurer in the resolution

of claims."  Berges, 896 So. 2d at 682.

Where "liability is clear, and injuries so serious that a judgment in excess of

the policy limits is likely, an insurer has an affirmative duty to initiate settlement

11

negotiations." Harvey, 259 So. 3d at 7 (quotation marks omitted). "In such a case, where the financial exposure to the insured is a ticking financial time bomb and suit can be filed at any time, any delay in making an offer . . . even where there was no assurance that the claim could be settled could be viewed by a fact finder as evidence of bad faith." Id. (cleaned up).

"In Florida, the question of whether an insurer has acted in bad faith in handling claims against the insured is determined under the 'totality of the circumstances' standard." Berges, 896 So. 2d at 680. Indeed "the critical inquiry" in a bad faith action is not whether an insurer met the obligations set out in Boston Old Colony but instead "whether the insurer diligently, and with the same haste and precision as if it were in the insured's shoes, worked on the insured's behalf to avoid an excess judgment." Harvey, 259 So. 3d at 7 (noting that the Boston Old Colony obligations "are not a mere checklist").

The "focus in a bad faith case is not on the actions of the claimant but rather on those of the insurer in fulfilling its obligations to the insured." Berges, 896 So. 2d at 677. For that reason, a claimant's "actions can[not] let the insurer off the hook when the evidence clearly establishes that the insurer acted in bad faith in handling the insured's claim." See Harvey, 259 So. 3d at 11 (emphasis added) (rejecting the "conclusion that where the [claimant]'s own actions[] even in part cause the judgment, the insurer cannot be found liable for bad faith") (quotation

12

marks omitted); id. (noting that "an insurer can[not] escape liability merely because the [claimant]'s actions could have contributed to the excess judgment") (emphasis added and footnote omitted); id. at 12 (rejecting the idea that, "regardless of what evidence may be presented in support of the [claimant]'s bad faith claim," the "insurer could be absolved of bad faith" if it "can put forth any evidence that the [claimant] acted imperfectly during the claims process," which "would essentially create a contributory negligence defense for insurers" that is "inconsistent with [Florida's] well-established bad faith jurisprudence").[6]

"[N]egligence is not the standard" for evaluating bad faith actions, Harvey, 259 So. 3d at 9, but "[b]ecause the duty of good faith involves diligence and care in the investigation and evaluation of the claim against the insured, negligence is relevant to the question of good faith," Boston Old Colony, 386 So. 2d at 785. And "[a]lthough bad faith is ordinarily a question for the jury, both this Court and

---

[6] In Harvey the Florida Supreme Court discussed the principle that the insurer cannot be absolved of bad faith based on the actions of the insured because it was the insured's actions that the District Court of Appeal had focused on in ruling for the insurer. 259 So. 3d at 4, 11–12. But the principle is equally applicable to the actions of a third-party claimant. We know that it is because the Court in Harvey was building off of this foundational principle from Berges, which involved the claimant's actions (in setting an allegedly unreasonable deadline) and which the Harvey opinion quoted four times: "[T]he focus in a bad faith case is not on the actions of the claimant but rather on those of the insurer in fulfilling its obligations to the insured." Harvey, 259 So. 3d at 7, 10, 11, 12 (quoting Berges, 896 So. 2d at 677). All of which is to say that the claimant and the insured are interchangeable for purposes of the principle that the focus in a Florida bad faith action is on the insurer, not on the insured or claimant.

For better clarity and flow, we have used brackets in the quotations from Harvey to replace the word "insured" with the word "claimant" because Pelaez is a third-party claimant.

13

Florida courts have granted summary judgment where there is no sufficient evidence from which any reasonable jury could have concluded that there was bad faith on the part of the insurer." Eres, 998 F.3d at 1278 (cleaned up); see also State Farm Fire & Cas. Co. v. Zebrowski, 706 So. 2d 275, 277 (Fla. 1997) (concluding, in a statutory third-party bad faith action, that summary judgment was appropriate). "While an overbroad release can create a jury question about bad faith, it doesn't necessarily do so." Eres, 998 F.3d at 1279.

## III.

Pelaez contends the district court erred in granting summary judgment to GEICO because there is "at least a fact question" about whether GEICO acted in bad faith. He says that a fact question exists because GEICO tendered its policy limits along with "an overbroad release that carried a known danger of rejection," and a "settlement offer cannot establish a lack of bad faith as a matter of law where it creates a known risk of not actually settling the claim and protecting the insured." Pelaez argues that by requiring its adjusters to send "all claims" releases with tender checks for only bodily injury claims GEICO is putting "its own interest ahead of that of its insureds," which is a "breach of the duty of good faith under Florida law."

GEICO responds that it "complied with its duties under Florida law and diligently worked on behalf of" its insured by quickly investigating the crash and

14

offering its bodily injury policy limit as soon as it discovered Pelaez was seriously injured and not at fault, which occurred less than two weeks after the crash. GEICO argues that the release it included in its proactive, unsolicited settlement offer included language that it made unmistakably clear was not being required, only proposed. GEICO adds that it didn't "fail to comply with a demand condition regarding a specific type of release" because Pelaez never told GEICO "it needed to provide a specific type of release" before rejecting the offer. Not only did GEICO never "require[] an overbroad release to settle" but it offered to accept changes to the release or even let Pelaez's attorney draft an entirely new one himself.

The district court agreed with GEICO that the overbroad release did not create a fact question under the totality of the circumstances of this case, and we agree with the well-reasoned holding of the district court. While we have recognized that an overbroad release can create a jury question about bad faith, we've also recognized that it "doesn't necessarily do so." Eres, 998 F.3d at 1279. That's true because "the question of whether an insurer has acted in bad faith in handling claims against the insured is determined under the 'totality of the circumstances' standard," Berges, 896 So. 2d at 680, and the scope of a release is one of the circumstances courts consider, but only one.

15

In Eres when we rejected an argument that an overbroad release created a jury question on bad faith, we explained that the argument's "singular focus on the allegedly overbroad release language ignore[d] the 'totality of the circumstances' — both what came before it and, perhaps even more importantly, what came after." 998 F.3d at 1279. The same is true here. As the district court convincingly explained, what came before and after GEICO sent Pelaez's attorney the overbroad release demonstrates that the company fulfilled its duty to act in good faith.

What came before GEICO sent the overbroad release is that it assigned an adjuster to the claim as soon as possible (the very next business day after the crash), and the adjuster immediately began investigating. His initial investigation didn't reveal the extent of Pelaez's injuries but did suggest, because of the low speed limit, the long skid marks, and the fact that no citations were issued to Conlon, that Pelaez may have contributed to causing the crash. Once GEICO got the police report that described Pelaez's serious injuries and dispelled the possibility that he had been contributorily negligent, GEICO decided right away to tender Pelaez the entire $50,000 bodily injury limit. Its claims adjuster called Pelaez's attorney the very next day to offer that full amount, and the day after that a $50,000 check for the full bodily injury policy limits was hand delivered to the attorney. The claims adjuster also asked for the company to be allowed to inspect the motorcycle so that it could settle the outstanding property damage claim.

16

On behalf of the Pelaez family, their attorney rejected the tendered $50,000 check to settle the bodily injury claim, a check that was inscribed "Tender of per person BI limits." And the check had come in a settlement package that included a cover sheet describing it as "representing tender of the per person policy limit under Bodily Injury Liability coverage." The attorney claimed that he and the family believed that GEICO had tried to take advantage of them by not excluding the motorcycle property damage claim from the proposed release that was in the settlement package. He took that position despite the fact that the letter and proposed release language were addressed not to pro se parties but to an attorney with more than 20 years of legal experience.

And despite the fact that the settlement package emphasized that the language of the release was simply proposed, not insisted on, and told Pelaez's attorney to feel free to send the company "any suggested changes, additions or deletions" he wanted or, if he preferred, to draft an entirely new release himself.

After receiving the attorney's rejection of its tender of the full bodily injury policy amount, purportedly because of the overbroad language of the release, GEICO immediately responded that the proposed language was only a starting point and once again invited Pelaez's attorney to send "additional language or changes" for the release. He never did so. Nor did he ever make any kind of

17

counter-offer to settle the claims against Conlon before filing the negligence lawsuit.  By contrast, GEICO earnestly attempted to settle all of the claims.

What the before, during, and after facts show here is that, as the district court aptly concluded, GEICO "did not act in bad faith in sending the unsolicited proposed release with the tender of the $50,000 BI policy limits under the circumstances of this case."  In Eres the insurer sent the claimant an overbroad release, which she contended established bad faith.  See 998 F.3d at 1279.  In rejecting that contention, we stated that "given [the insurer]'s offer to 'strike' the offending language, it's not clear to us that there would be a jury question regarding bad faith even if [the insurer]'s release contained [problematic] language."  Id.  We explained: "[W]hen federal courts have found a fact issue regarding bad faith based on overbroad release language, they have relied on the insurers' refusal to remove the release's" problematic language.  Id. (alteration adopted and quotation marks omitted).  In this case GEICO not only offered to change any problematic language but to let Pelaez's attorney re-draft the release if he preferred.  It would have been a simple thing for the attorney to do, but it is also the last thing he wanted to do.

Pelaez's attorney declined the offer to cure any problem with the release because he had higher goals to pursue.  As his rejection letter explained, the attorney suspected the overbroad release was part of a "wide spread practice" by

18

GEICO to "increase profits by compromising the rights of consumers," and he worried about "[h]ow many tragically injured people have signed away their rights . . . by signing the release of all claims when property damages were still due." He said that the Pelaez family had instructed him "to proceed to suit" instead of "[s]ettling on a more limited release" because the "fact that, with [his] counsel, they kn[e]w better than to sign" the overbroad release did "not solve the problem" of GEICO "prey[ing] on the next accident victim who may not have a lawyer at all when signing away all claims." (Of course, in this case GEICO's settlement package was not addressed to pro se claimants but to the experienced attorney it knew was representing the claimants.)

In later deposition testimony, Pelaez's attorney described what he saw as GEICO's "taking advantage of people" using overbroad releases as "just wrong" and said his decision not to tell GEICO what he wanted in the release came from the Pelaez family's desire "to effectuate change, do the right thing." "And the right thing was not taking $50,000 and turning their back on folks [who] might otherwise become prey for the insurance company" — it was to "help" people by "prevent[ing] this type of bold improper predatory insurance practice [from] continu[ing]." Choosing to "take $50,000" and either sign an "unfair, overbroad release" or explain to GEICO what was wrong with the release "would not have fulfilled [his] fiduciary obligations as an advocate and as a human being" because,

19

in his and the Pelaez family's opinion, doing the right thing "can't be just about the money ever." He and his clients kept the insurance claims from settling out of a noble desire to further the wellbeing of humankind, not merely because a $14,900,000 judgment is bigger than a $50,000 settlement. To hear the attorney tell it, the prospect of fourteen million, eight hundred and fifty thousand additional dollars had nothing to do with it. The wellbeing of humankind was the reason he and his clients rejected GEICO's efforts to settle. Okay, but that does not establish that GEICO acted in bad faith.

All of the facts we have recounted are part of the totality of the circumstances that go into the decision of whether GEICO did act in bad faith when handling Pelaez's claims against Conlon and his mother. We heed, as we must, the Florida Supreme Court's recent reminder that the "focus in a bad faith case is not on the actions of the claimant but rather on those of the insurer in fulfilling its obligations to the insured." Harvey, 259 So. 3d at 11 (quoting Berges, 896 So. 2d at 677). But we don't understand that principle to mean the actions of a claimant — or a claimant's attorney — are irrelevant. In a bad faith action there's a difference between focusing on a claimant's actions, which would be improper, and factoring a claimant's actions into the totality of the circumstances analysis, which is not improper.

20

The Florida Supreme Court implicitly recognized this kind of difference in Harvey when it held that an insurer should not be allowed to "escape liability merely because the [claimant]'s actions could have contributed" to a failure to settle.  See id. (emphasis added).  And it made clear that a "[claimant]'s actions can[not] let the insurer off the hook when the evidence clearly establishes that the insurer acted in bad faith in handling the insured's claim."  See id. (emphasis added).  But we aren't absolving GEICO of liability by faulting Pelaez and his attorney's conduct or by questioning their motives.  And we are taking it as a given that they've "identified some ways" GEICO "might improve its claims-processing practice."  Eres, 998 F.3d at 1281.

We aren't allowing GEICO to "escape liability merely because" Pelaez and his attorney's actions "could have contributed" to the failure to settle.  Harvey, 259 So. 3d at 11.  As they clearly did.  Instead, we have discussed Pelaez and his attorney's actions because they show how, in the totality of these circumstances, GEICO did fulfill its good faith duty to Conlon and his mother.  They show how the failure to settle the lawsuit against the insureds did not result from bad faith of the insurer.

Because no reasonable jury could conclude that GEICO acted in bad faith before, during, or after sending the proposed release to Pelaez, summary judgment

21

was appropriately entered for it.  See, e.g., Eres, 998 F.3d at 1278; Zebrowski, 706

So. 2d at 277.

**AFFIRMED.**