[DO NOT PUBLISH]

In the

# United States Court of Appeals

For the Eleventh Circuit

_____

No. 19-13535

_____

DIAGNOSTIC LEASING, INC.,
a Florida Corporation, for itself and as the
assignee of Blocker Transfer Company, a Florida Corporation
d.b.a. Blocker Transfer and Storage Co., Inc.,

Plaintiff-Appellant,

*versus*

ASSOCIATED INDEMNITY CORPORATION,
a California Corporation,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Middle District of Florida
D.C. Docket No. 8:16-cv-00958-CEH-TGW

_____

Before ROSENBAUM, LUCK, and ANDERSON, Circuit Judges.

LUCK, Circuit Judge:

The district court granted summary judgment for Associated Indemnity Corp. on Diagnostic Leasing, Inc.'s bad faith claims. After oral argument and careful review of the record, we affirm.

## FACTUAL BACKGROUND[1]

### *The Fire*

Blocker Transfer & Storage Co. "operated various warehouse storage facilities" that it owned or leased "as part of its business as a moving and storage company." Diagnostic Leasing was an equipment rental and leasing company. In 1995, Blocker

---

[1] Because Diagnostic Leasing—the nonmoving party—appeals the district court's summary judgment for Associated Indemnity, we discuss the facts in the light most favorable to Diagnostic Leasing. *See Cowen v. Ga. Sec'y of State*, 960 F.3d 1339, 1342 (11th Cir. 2020) ("In reviewing the propriety of summary judgment, 'we view the evidence in the light most favorable to the nonmoving party.'" (citation omitted)).

Storage stored Diagnostic Leasing's computerized tomography (CT) scanner. Associated Indemnity insured Blocker Storage under the trade name "Fireman's Fund Insurance Company." Fireman's Fund was also "a separate legal incorporated entity that was authorized to transact business and issue policies," and Fireman's Fund and Associated Indemnity were two separate companies under the umbrella of Allianz Global.

That same year, two fires at Blocker Storage's warehouses damaged Diagnostic Leasing's CT scanner. After the first fire, Blocker Storage informed Associated Indemnity about the damage to the CT scanner. Fireman's Fund promptly assigned the claim to an independent insurance adjuster. Meanwhile, Diagnostic Leasing sent a demand letter to Blocker Storage requesting that Blocker Storage settle the matter within thirty days for the replacement cost of the CT scanner—$263,000. Diagnostic Leasing also requested the name of any insurer with whom Blocker Storage or the warehouse had coverage and the details of any applicable insurance policies.

Fireman's Fund responded to Diagnostic Leasing's demand letter with a certified copy of the insurance policy "issued" and "provided by" Associated Indemnity but did not address Diagnostic Leasing's settlement demand. Fireman's Fund then informed Blocker Storage that the coverage limit for Diagnostic Leasing's insurance claim was $100,000 and that "Fireman's Fund [] decided to make available to Blocker [Storage]" the full $100,000 to use at Blocker Storage's discretion. Fireman's Fund advised Blocker

Storage that any settlement in excess of $100,000 would have to be paid by Blocker Storage.  Blocker Storage maintained that its liability was limited to $25,000 based on a contractual provision in the bill of lading from when the CT scanner was first moved into storage.

After the second fire, Diagnostic Leasing sent a second demand letter, this time to Fireman's Fund directly, asserting a higher replacement cost for the CT scanner—$427,515.  Fireman's Fund advised Blocker Storage that it could not respond to Diagnostic Leasing on Blocker Storage's behalf because of Blocker Storage's uninsured exposure in excess of $100,000.  Fireman's Fund suggested to Blocker Storage that the parties engage in a settlement conference.  In response, Blocker Storage "specifically instructed" Fireman's Fund that "it d[id] not want any of its insurance coverage tendered" to Diagnostic Leasing because "its maximum liability . . . [wa]s $25,000" and "[a] tendering of any amount by the Fireman's Fund directly to [Diagnostic Leasing] m[ight] prejudice Blocker [Storage] in enforcing its limitation of liability."

In October 1996, Fireman's Fund contacted Diagnostic Leasing requesting "information regarding the cost of repair and the cost to determine the amount of damages to the [CT] scanner and replacement cost for the [CT] scanner" as a result of the insurance policy that "Fireman's Fund issued" to Blocker Storage.  Fireman's Fund contacted Diagnostic Leasing again, several months later, "on behalf of its insured, Blocker [Storage]," to find out "what

[Diagnostic Leasing]'s intentions [we]re with regard to the claim it made against Blocker [Storage]."

### The Two Lawsuits

In 1999, after years of unsuccessful settlement attempts, Diagnostic Leasing sued Blocker Storage in Florida state court for breach of contract, negligent bailment, and spoliation of evidence. Fireman's Fund provided counsel to represent Blocker Storage alongside Blocker Storage's independent counsel, although Blocker Storage's independent counsel led Blocker Storage's defense and made all relevant decisions on Blocker Storage's behalf. When Blocker Storage's independent counsel passed away, counsel provided by Fireman's Fund withdrew from Blocker Storage's representation. Associated Indemnity then provided counsel to represent Blocker Storage. Associated Indemnity repeatedly advised Blocker Storage to retain its own independent counsel, but Blocker Storage did not do so.

While litigation against Blocker Storage was pending, Blocker Storage sued Fireman's Fund seeking a declaratory judgment regarding Blocker Storage's claims under the insurance policy. In 2001, Blocker Storage and Fireman's Fund executed a "Release of All Claims" to resolve the declaratory judgment lawsuit. Blocker Storage and Fireman's Fund "agree[d] that the limit of liability coverage available, pursuant to the terms and conditions of the [p]olicy, for the [first] fire [wa]s $100,000." In exchange, Blocker Storage released "Fireman's Fund, its employees, adjusters, agents[,] and attorneys" from:

all liabilities identified in Blocker [Storage]'s com-
plaint including, but not limited to, the matter of
number of occurrences, the matter of the limits of in-
surance available and the alleged breach of contract.
This [r]elease includes, but is not limited to, all claims
for contractual damages, extra-contractual damages,
"bad[]faith" damages, whether statutory or common
law, consequential damages, tort damages, attorney
fees, expert costs, expenses and interest, arising out of
or related to the allegations in Blocker [Storage]'s
complaint.

After ten years of litigating the breach of contract, bailment,
and spoliation case, the state court granted judgment for Diagnos-
tic Leasing against Blocker Storage after a bench trial, finding that
Blocker Storage's alleged $25,000 liability limitation was unen-
forceable and that Blocker Storage owed Diagnostic Leasing
$451,431.82 plus prejudgment interest ($229,431.82 in lost revenue
and $222,000 to replace the CT scanner). *Diagnostic Leasing, Inc.
v. Blocker Transfer Co.*, No. 99-3540 (Fla. 13th Cir. Ct. Feb. 4,
2011). Diagnostic Leasing moved to include Fireman's Fund and
Associated Indemnity as parties to the final judgment, and Fire-
man's Fund, Associated Indemnity, and Diagnostic Leasing negoti-
ated an agreed order to include Associated Indemnity as a party to
the final judgment and deny Diagnostic Leasing's motion to in-
clude Fireman's Fund. The state court entered the agreed order,
granting the motion with respect to Associated Indemnity, finding
Associated Indemnity liable to the extent of its $100,000 coverage

limit under the insurance policy, and denying the motion with regard to Fireman's Fund. The state court entered final judgment against Blocker Storage for $994,638.37; $100,000 of that amount was recoverable from Associated Indemnity per the agreed order.

## PROCEDURAL HISTORY

In 2015, Blocker Storage assigned its rights under the insurance policy, including any bad faith claims, to Diagnostic Leasing. Two and a half months later, Diagnostic Leasing sued Associated Indemnity in Florida state court for first party bad faith, as Blocker Storage's assignee under the insurance policy, and third party bad faith for failing to settle Diagnostic Leasing's insurance claim against Blocker Storage. Diagnostic Leasing alleged that Associated Indemnity:

> never attempted in good faith to settle [Diagnostic Leasing]'s pre-suit claim for the [first] fire loss, or the lawsuit filed by [Diagnostic Leasing], for the policy limits of liability coverage for third[]party claims under the . . . [p]olicy, when under all the circumstances [Associated Indemnity] could have and should have done so had it acted fairly and honestly towards its insured, Blocker [Storage], and with due regard for its interests.

Associated Indemnity removed the case to federal court and moved for summary judgment. Associated Indemnity argued that: (1) it did not breach its duty of good faith to Blocker Storage; (2) the 2001 release covered Associated Indemnity as an agent of

Fireman's Fund and gave up any bad faith claims arising from the fires; (3) Diagnostic Leasing was judicially and collaterally estopped from relitigating the policy limits; and (4) Diagnostic Leasing could not assert bad faith claims because it never made a demand within the policy limits.

The district court granted summary judgment for Associated Indemnity.  Although the district court agreed with Diagnostic Leasing that a reasonable jury could find that Associated Indemnity acted in bad faith in investigating the first fire, the district court concluded that the 2001 release between Blocker Storage and Fireman's Fund released Diagnostic Leasing's bad faith claims.  The district court found that there was no genuine dispute that Associated Indemnity was an agent of Fireman's Fund covered by the release because:  (1) Fireman's Fund directed Associated Indemnity to undertake Blocker Storage's defense in the underlying litigation; (2) "the overwhelming evidence show[ed] that [Fireman's Fund] and [Associated Indemnity] operated as one entity with respect to the [p]olicy and the claim throughout the process"; and (3) "the parties understood there to be one [p]olicy investigated by [Fireman's Fund] and to be paid by [Associated Indemnity]."

The district court concluded that the 2001 release was "clear and unambiguous, and release[d] [Fireman's Fund] and its agents—including [Associated Indemnity]—from any bad faith claim arising out of or related to the allegations of Blocker [Storage]'s complaint, which included allegations as to the location of the fire and the [p]olicy limit."  The district court found that the 2001 release was

"extremely broad" and did not preserve Diagnostic Leasing's bad faith claims, and that Diagnostic Leasing's third party bad faith claim was derivative of Associated Indemnity's first party bad faith claim. The district court concluded, "Because Blocker [Storage] released any bad faith claim founded on [Fireman's Fund]'s coverage of the fires at Blocker [Storage]'s warehouse . . . that had accrued at the time of the [r]elease, including any claim [regarding the location of] the first fire," Diagnostic Leasing could not "raise such a claim."

Diagnostic Leasing moved for relief from the district court's summary judgment under Rule 60(b), arguing that the district court overlooked evidence that established a genuine issue of material fact as to whether Associated Indemnity was an agent of Fireman's Fund and covered by the 2001 release. Diagnostic Leasing also argued that the district court erroneously relied on its failure to make a demand within the policy limits to grant summary judgment for Associated Indemnity.

The district court denied Diagnostic Leasing's Rule 60(b) motion because: (1) Diagnostic Leasing "failed to cite to any evidence that demonstrated [that] the [c]ourt made a mistake in fact or law in determining that the undisputed evidence showed that [Associated Indemnity] was an agent of [Fireman's Fund]"; (2) Diagnostic Leasing failed to show "that the [c]ourt incorrectly ruled that the [r]elease extinguished any bad faith claim"; and (3) Diagnostic Leasing's argument as to the demand within policy limits depended "on the [r]elease being inapplicable." Because

Diagnostic Leasing "failed to demonstrate that the [c]ourt made a mistake of law or fact regarding the [r]elease, or that other circumstances justif[ied] relief from th[e] [c]ourt's ruling regarding the [r]elease," the district court concluded that Diagnostic Leasing was not entitled to relief from judgment.

## STANDARD OF REVIEW

"'We review the district court's grant of summary judgment de novo, viewing all facts and drawing all inferences in the light most favorable to' the nonmoving party." *Pelaez v. Gov't Emps. Ins. Co.*, 13 F.4th 1243, 1249 (11th Cir. 2021) (citation omitted). Summary judgment is appropriate when the evidence "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

## DISCUSSION

Diagnostic Leasing argues that the district court erred in granting summary judgment for Associated Indemnity on its bad faith claims because: (1) there was a genuine dispute of material fact as to whether Associated Indemnity was an agent of Fireman's Fund; (2) the 2001 release could not preclude Diagnostic Leasing's third party claims; (3) the 2001 release was the result of a mutual mistake about the location of the first fire; and (4) Blocker Storage and Fireman's Fund did not intend for the 2001 release to cover nonsignors.

We disagree.  Diagnostic Leasing did not establish a genuine dispute as to whether Associated Indemnity was an agent of Fireman's Fund or as to whether the 2001 release gave up Diagnostic Leasing's bad faith claims against Associated Indemnity, and Diagnostic Leasing forfeited its other two arguments by failing to raise them below.

### Agency

Under Florida law, "[g]enerally, the existence of an agency relationship is a question of fact; however, when the moving party fails to produce any supportive evidence or when the evidence presented is so unequivocal that reasonable persons could reach but one conclusion, that question of fact becomes a question of law to be determined by the court." *Marchisio v. Carrington Mortg. Servs., LLC*, 919 F.3d 1288, 1311 (11th Cir. 2019) (quoting *Hickman v. Barclay's Int'l Realty, Inc.*, 5 So. 3d 804, 806 (Fla. Dist. Ct. App. 2009)).

"[A]n agency relationship may be express or implied from apparent authority, and the burden of proving the agency belongs to the party asserting it." *Id.* (citation omitted).  "The key element in establishing actual agency is the control by the principal over the actions of the agent." *Id.* (quoting *Hickman*, 5 So. 3d at 806).  "And it is the *right* of control, not *actual* control or descriptive labels employed by the parties, that determines an agency relationship." *Id.* (quoting *Hickman*, 5 So. 3d at 806).

Here, "the evidence presented [wa]s so unequivocal that reasonable persons could reach but one conclusion": Associated Indemnity was Fireman's Fund's agent. *See id*. The summary judgment evidence showed that Associated Indemnity and Fireman's Fund were closely related. Nearly all written communications from Associated Indemnity to Blocker Storage regarding the fires and settlement were provided on Fireman's Fund letterhead. According to Allianz Global's insurance adjuster, "Fireman's Fund [and] Associated Indemnity are all companies within Allianz Global," and Fireman's Fund's counsel testified that Fireman's Fund and Associated Indemnity "were treated as one and the same because it was one contract written by [Associated Indemnity] which is an affiliate[] [of] Fireman's Fund."

Diagnostic Leasing and Blocker Storage understood that the two companies were closely related. Diagnostic Leasing's counsel referred to "Fireman's Fund" and "Associated Indemnity" "interchangeably" and described Associated Indemnity as "literally the same company as Fireman's Fund." Blocker Storage agreed that Associated Indemnity "was literally the same company as Fireman's Fund." And, during litigation against Diagnostic Leasing, Blocker Storage's counsel "abbreviated everything FFIC," short for Fireman's Fund, because Fireman's Fund was "a parent company of several different entities . . . . Everything was always Fireman's Fund."

The summary judgment evidence also showed that Fireman's Fund had the right to control Associated Indemnity. First,

the policy, named "Fireman's Fund Insurance Policy," was issued by Associated Indemnity on Fireman's Fund's behalf. "All parties used the generic Fireman's Fund to refer to this specific [Associated Indemnity] policy," and it was Fireman's Fund, not Associated Indemnity, that promptly assigned Diagnostic Leasing's insurance claim to an independent insurance adjuster and responded to Diagnostic Leasing's settlement demand with a certified copy of the policy. When Diagnostic Leasing asked Associated Indemnity about the policy, it was Fireman's Fund that answered.

Second, Fireman's Fund directed Associated Indemnity to: (1) defend Blocker Storage in litigation over the policy; and (2) offer Blocker Storage the policy limits to settle Diagnostic Leasing's insurance claim. As the district court explained, "after the lawsuit was filed by Diagnostic Leasing against Blocker [Storage], a letter with [Fireman's Fund] letterhead was sent to Blocker [Storage] stating that [Associated Indemnity] received the complaint and would provide a defense to Blocker [Storage]." Fireman's Fund communicated directly with Blocker Storage and indicated that Associated Indemnity would provide Blocker Storage's defense in its litigation against Diagnostic Leasing. Fireman's Fund also communicated directly with Blocker Storage that the coverage limit for Diagnostic Leasing's insurance claim was $100,000 and that "Fireman's Fund [] decided to make available to Blocker [Storage]" the full $100,000 to use at Blocker Storage's discretion. Fireman's Fund was in control of Associated Indemnity's response to issues related to the policy.

Third, Fireman's Fund negotiated the 2001 release on behalf of itself and its agents for all claims arising from the policy. Blocker Storage released "Fireman's Fund, its employees, adjusters, agents[,] and attorneys" from "all liabilities identified in Blocker Storage's complaint," which sought a declaratory judgment regarding Blocker Storage's insurance claims under the policy.

Diagnostic Leasing offered no evidence showing that Fireman's Fund didn't control Associated Indemnity. Diagnostic Leasing only argues that Associated Indemnity and Fireman's Fund were separate companies, but that doesn't tell us if one company was the agent of the other. The undisputed evidence showed that it was.

Because (1) the policy was issued by Associated Indemnity on behalf of Fireman's Fund; (2) Fireman's Fund directed Associated Indemnity to defend Blocker Storage and offer Blocker Storage the policy limits to settle Diagnostic Leasing's insurance claim; and (3) Fireman's Fund negotiated the 2001 release to release Blocker Storage's claims arising from the policy; and because Diagnostic Leasing did not rebut the evidence of an agency relationship, the district court did not err in granting summary judgment for Associated Indemnity on the agency issue.

*Effect of the 2001 Release*

Diagnostic Leasing next argues that the district court erred in concluding that the 2001 release gave up its third party bad faith claim because it was "separate and distinct" from Blocker Storage's

first party bad faith claim. In particular, Diagnostic Leasing argues that Associated Indemnity could not have been released in 2001 by Blocker Storage because Diagnostic Leasing was not named in the 2001 release, Blocker Storage was not an agent of Diagnostic Leasing when it signed the 2001 release, and Diagnostic Leasing's third party bad faith claim did not accrue until 2011.

But, under Florida law, once the insured releases the insurer from liability, the insured no longer has a cause of action against the insurer and neither does an injured third party. *See Fid. & Cas. Co. of N.Y. v. Cope*, 462 So. 2d 459, 461 (Fla. 1985) ("Upon [the judgment] being satisfied, [the insured party] no longer had a cause of action; if he did not, then [the injured party] did not.").

The 2001 release was not limited to only those claims that existed at the time of the release; it released "all claims for . . . 'bad[]faith' damages, . . . arising out of or related to" Blocker Storage's insurance claims under the policy. Any bad faith claims against Associated Indemnity related to Blocker Storage's insurance claims under the policy, so it is irrelevant whether Blocker Storage was acting as an agent of Diagnostic Leasing when Blocker Storage signed the release or whether Diagnostic Leasing was named in the release. *See id.* ("[The injured party's] action was not separate and distinct from, but was derivative of[,] [the insured party].").

The Florida Supreme Court has explained that, "absent a prior assignment of the cause of action, once an injured party has released the tortfeasor from all liability . . . no such [bad faith]

action may be maintained." *Id.* at 459.  Once Blocker Storage released Associated Indemnity from liability "arising out of or related to" Blocker Storage's insurance claims under the policy, including liability for any bad faith, "no such [bad faith] action [could] be maintained" by Diagnostic Leasing against Associated Indemnity. *See id.*  And Associated Indemnity owed no independent duty of good faith to Diagnostic Leasing.  *See id.* at 461 ("We did not extend the duty of good faith by an insurer to its insured to a duty of an insurer to a third party.").

Diagnostic Leasing argues that this result is inconsistent with *Travelers Insurance Co. v. Perez*, 384 So. 2d 971, 973 (Fla. Dist. Ct. App. 1980).  In *Travelers*, the Florida Third District Court of Appeal concluded that a third party's "right to bring a direct action for bad faith against the insurer vested in or accrued to [it] at the same time [it] became entitled to sue the insured" and, once the third party "obtained the right to proceed against the insurer[,] [it] could not be divested of that right by the actions of the insured or insurer without [its] consent." *Id.* (citations omitted).

But *Travelers* only addressed "the question of whether a release of all claims executed by the insured in favor of the insurer . . . bars a 'bad faith' action against the insurer by [an] injured third party" when the release was executed "*subsequent* to the entry of an excess judgment in favor of [the] injured third party." *Id.* at 972 (emphasis added).  *Travelers* didn't address the issue of whether a release executed *prior* to the entry of an excess judgment can relinquish bad faith claims, which is what we have here.  *Cope*

answered that question and the Florida Supreme Court's answer binds us here. *See State Farm Fire & Cas. Co. v. Steinberg*, 393 F.3d 1226, 1231 (11th Cir. 2004) (in diversity cases "[o]ur objective is to determine the issues of state law as we believe the Florida Supreme Court would"—only "[i]n the absence of definitive guidance from the Florida Supreme Court, [do] we follow relevant decisions of Florida's intermediate appellate courts").

Because the 2001 release preceded the assignment of Blocker Storage's claims under the insurance policy and released Associated Indemnity of "all claims . . . for 'bad[]faith' damages" arising out of or related to" Blocker Storage's insurance claims under the policy, the release extinguished Diagnostic Leasing's claims for bad faith, which existed only by virtue of Blocker Storage's insurance relationship with Associated Indemnity.

### Mutual Mistake

Diagnostic Leasing argues for the first time on appeal that the 2001 release is unenforceable because it was based on a mutual mistake of fact regarding the location of the May 1995 fire and applicable policy limit. But Diagnostic Leasing "cannot readily complain about the entry of a summary judgment order that did not consider an argument [it] chose not to develop for the district court at the time of the summary judgment motions." *See Johnson v. Bd. of Regents of Univ. of Ga.*, 263 F.3d 1234, 1264 (11th Cir. 2001). Because Diagnostic Leasing failed to raise mutual mistake before the district court, it forfeited the argument on appeal. *See Resol.*

*Tr. Corp. v. Dunmar Corp.*, 43 F.3d 587, 598 (11th Cir. 1995) ("Well-settled precedent provides that arguments not raised at the district court level will generally not be considered on appeal.").

### Intention to Cover Nonsignors

Diagnostic Leasing also argues for the first time on appeal that the 2001 release and Blocker Storage's and Fireman's Fund's conduct lacked the necessary "clear manifestation" that the release covered nonsignors. Diagnostic Leasing forfeited this argument, too. *See id.* But, even if it didn't, the 2001 release and the parties' conduct exhibited a clear manifestation of intent to cover Associated Indemnity.

The 2001 release gave up any bad faith claims arising out of Fireman's Fund's investigation and handling of the fires. It used broad language that covered "all claims for contractual damages, extra-contractual damages, 'bad[]faith' damages, . . . arising out of or related to the allegations in Blocker [Storage]'s complaint" and applied to "Fireman's Fund, its employees, adjusters, agents[,] and attorneys." The 2001 release also settled the amount of Associated Indemnity's liability under its insurance policy issued to Blocker Storage and referenced the underlying litigation between Blocker Storage and Diagnostic Leasing where Associated Indemnity was the insurer and funded Blocker Storage's defense. And Blocker Storage and Fireman's Fund's shared understanding that Associated Indemnity and Fireman's Fund were one and the same in the context of the policy supported the conclusion that Blocker Storage

and Fireman's Fund intended to cover Associated Indemnity by the 2001 release.  Diagnostic Leasing does not point to any contrary summary judgment evidence.

**AFFIRMED.**